760 A.2d 1128

IN THE MATTER OF HENRIETTA NEUFELD COHEN,
AN ADJUDGED MENTAL INCOMPETENT.

Superior Court of New Jersey
Appellate Division

Argued September 13, 2000—Decided November 6, 2000.

Before Judges KING, COBURN and AXELRAD.

*Charles W. Heuisler* argued the cause for appellant Michelle Cohen (*Archer & Greiner*, attorneys; *Mr. Heuisler* and *Arthur H. Jones*, on the brief).

*Youngblood, Corcoran*, attorneys for appellant Douglas Cohen; *Joseph Youngblood*, of counsel, joins in the brief filed on behalf of Michelle Cohen.

*J. Philip Kirchner* argued the cause for respondent Howard D. Cohen, M.D. (*Flaster Greenberg*, attorneys; *Mr. Kirchner*, on the brief).

The opinion of the court was delivered by

AXELRAD, J.T.C. (temporarily assigned).

This is an appeal from the Chancery Division judge's August 11, 1999 order enforcing the terms of a purported settlement agreement, which alters the will and estate plan of Henrietta Neufeld

Cohen ("Henrietta"). Henrietta is a ninety-six year-old grandmother who is alive but legally incompetent. The appeal is filed by Michelle Cohen ("Michelle"), Henrietta's granddaughter, who is age twenty-nine and developmentally disabled, through her mother, Karen Jorgensen as guardian ad litem. Michelle's appeal is based on the following contentions: (1) the purported settlement agreement is an impermissible reformation of Henrietta's testamentary plan; (2) the purported settlement agreement is an impermissible gifting plan; and (3) there is no enforceable settlement since there was a lack of agreement on material terms. On May 11, 2000 we granted Michelle's emergent application for a stay pending appeal and acceleration of oral argument.

## I

The material facts are as follows. Henrietta, a widow, presently resides at the Linwood Convalescent Center in Linwood, New Jersey. Henrietta had two children, Howard Cohen, M.D. ("Howard") and Charles Cohen ("Charles"). Howard is presently married to Jacqueline and was previously married to Karen Jorgensen. Two children were born of Howard's marriage to Karen Jorgensen, Douglas Cohen ("Douglas"), age twenty-seven, and Michelle. Charles died in 1987 and has two children, Alan J. Cohen, Esquire ("Alan") and Rabbi Bruce Cohen ("Bruce"). Alan is married to Barbara, and they have two minor children. Bruce is married to Debra, and they have two minor children.

On August 4, 1992 Henrietta executed estate planning documents that were drafted by Ronald Wagenheim, Esquire, of Cooper Perskie. Pursuant to a Revocable Trust Agreement with the predecessor of First Union Bank, Henrietta divided her approximately $5 million estate in half between the two sides of her family—the Howard side and the Charles side. Half of the corpus was to be held for the benefit of Howard and his children, with seventy percent to be held in trust for Howard. The remainder of Howard's life estate was to be evenly divided upon Howard's death between trusts established for the benefit of

Douglas and Michelle. The remaining thirty percent allocated to Howard's side of the family was to be divided evenly into separate trusts for Douglas and Michelle. The other half of the corpus was to be evenly divided between Charles' sons, Alan and Bruce, free of trust.

Henrietta contemporaneously executed a last will and testament, which provided bequests to various charities and bequests of personal property. Henrietta's last will and testament also directed that her residuary estate be paid to the August 4, 1992 trust and distributed in accordance with its provisions. No provisions were made in Henrietta's estate plan for Howard's second wife, Jacqueline.

In October 1996, Howard retained Albert F. McGee, Jr., an attorney, ("McGee") to investigate Henrietta's existing testamentary plans. Howard, McGee, and Jacqueline met with Henrietta to effectuate a new testamentary plan, which they represented would provide for estate, gift, and income tax savings to Henrietta and her family. This new testamentary plan would also contain provisions for Jacqueline.

Alan, who was supervising Henrietta's affairs at the time, filed a complaint in the Chancery Division, Probate Part, on January 10, 1997, seeking to declare his grandmother Henrietta legally incompetent.[1] Howard, Michelle, Douglas, and Bruce intervened in the

[1] According to Alan's certification in opposition to the payment of McGee's fees, Henrietta's deteriorating mental condition and Howard's actions precipitated Alan's filing of the incompetency complaint. Alan had "grave concern" about Howard and McGee's sudden involvement in Henrietta's affairs, particularly regarding why his grandmother would hire a new attorney when she had been represented by the Cooper Perskie firm for twenty years, and why Howard, for the first time ever, was involved in Henrietta's financial affairs. His other concern was whether McGee had a conflict of interest representing both Henrietta and Howard, because the " 'interests' of Howard Cohen and his wife were inconsistent with those of Mrs. Cohen ... [as] Mrs. Cohen had financial and testamentary wishes that were readily observable to be contrary to what could be assumed to be Dr. Cohen's desires." On March 6, 1997 the judge issued a restraining order preventing McGee from further contact with Henrietta, except in the presence of a court reporter and her guardian.

incompetency action. Prior to the finding of incompetency, there were numerous cross-claims and counterclaims between the two sides of Henrietta's family. In addition to Howard's allegations in the first four counts of his counterclaim of improprieties by Alan acting under the power of attorney which had been issued, Howard's fifth count also alleged that the 1992 Trust Agreement may have been executed while Henrietta was incompetent and subject to undue influence. The fifth count of his counterclaim averred that

> the present documents [*i.e.*, Henrietta's 1992 last will and testament and trust agreement] do not adequately effectuate her intent as to the objects of her bounty and may have been executed when she was incompetent and/or subject to undue influence. In addition, said documents do not effectuate the maximum saving of estate taxes and should be modified for that purpose as well.

Howard sought authority to implement "more appropriate testamentary and inter-vivos documents" for Henrietta. More specifically, Howard attempted to set aside pre-mortem the will and estate plan, which Henrietta effectuated in 1992 through Wagenheim, and substitute the plan prepared by McGee.

On May 20, 1997 the judge issued an order declaring Henrietta incompetent and "incapable of governing herself and managing her affairs as a result of unsoundness of mind." The judge appointed William Schultz, an attorney, as an independent guardian for Henrietta's property, and appointed Howard and Alan as co-guardians of her person. The judge then entered various management orders concerning Howard's five-count counterclaim, Alan's cross-claim against Howard, and the fee application dispute of McGee.

Subsequently, J. Philip Kirchner was substituted for Richard Hyland in the representation of Howard. Jeffrey Waldman was substituted for John Rosenberger in the representation of Bruce, and Joseph Youngblood was substituted for Thomas Haynes in the representation of Douglas. Thomas Haynes continued to represent Michelle until some time after April 19, 1999, when Charles Heuisler was substituted for Thomas Haynes on behalf of Michelle and Karen Jorgensen, Michelle's guardian ad litem.

In a motion dated November 13, 1997 Howard sought to implement the McGee "comprehensive gift and financial plan" for the management of Henrietta's estate as a substitute for the testamentary plan contemplated by the 1992 trust agreement. The plan was allegedly designed to provide for lifetime care of Henrietta, distributions to her family, restructuring of her investment portfolio, centralized investment management, and the minimization of enormous amounts of generation-skipping transfer taxes and estate and gift taxes that would have resulted from the 1992 Trust Agreement. The plan formed the basis and the starting point for all subsequent settlement negotiations among the parties. The judge adjourned Howard's motion indefinitely to give counsel and the parties an opportunity to study the McGee plan and to see whether they could consensually resolve the issues.

At the request of Michelle and Douglas, the court appointed an expert tax advisor, at the expense of Henrietta's estate, to advise the parties of the feasibility, benefits, and risks associated with Howard's plan. The court-appointed expert, Leonard Goldberg, a prominent New Jersey tax and estate-planning lawyer, prepared a written report that adopted many of the features of the McGee plan but differed in certain respects.

On August 3, 1998, following circulation of the expert's report, the judge convened a settlement conference with all parties and their counsel present. The parties used a draft of the McGee plan as the basis for their negotiations. As a result of the differences of opinion among the parties, respecting the status of the case, Howard's counsel filed a motion to enforce the purported settlement agreement, which he contended had been reached as a result of the August 3, 1998 settlement conference. Howard's counsel certified that all disputed issues identified at the beginning of the conference had been resolved at the conclusion of that conference, and that the only issue left to be resolved was the issue of reimbursement by Henrietta's estate of counsel fees incurred by either of the co-guardians of her person.

In a telephone conference and confirming letter, the judge scheduled argument for October 9, 1998 on the motion to enforce. The judge suggested that the parties attempt to settle the matter because if the issues were not "otherwise addressed" by the return date of the motion to dismiss, he would

> *sua sponte*, determine (a) whether any party has standing to challenge the incompetent's will before her death and (b) whether the creation of a new testamentary plan is permissible under the circumstances set out here. This last issue is, I think, closely related to my request that the parties consider whether these issues can be settled and implicates the extent to which *In re Trott*, 118 *N.J.Super.* 436 [288 *A.*2d 303] (Ch.Div.1972) permits the modification of a testamentary scheme to effectuate tax savings.

The judge heard argument on October 9, 1998; the substance of his ruling was set forth in an October 23, 1998 order, which reads in relevant part:

> A. The motion of Dr. Howard Cohen to enforce settlement and for attorney's fees and costs is denied.
>
> B. Howard Cohen, MD has no present standing to maintain an action to contest the 1992 Will and Trust Agreement of Henrietta Cohen;
>
> C. The Court shall hold an evidential hearing as to Counts 1, 2, 3 and 4 of Dr. Howard Cohen's counterclaim against Alan Cohen;
>
> D. The Court shall hold a second evidentiary hearing to determine the appropriateness of the "gifting and financial" plan submitted by Albert F. McGee, Jr., Esquire on behalf of Howard Cohen, MD, and whether such plan will generate actual tax savings to the Estate of Henrietta Neufeld Cohen. The purposes of this hearing will be to determine:
>
> > 1. Whether, if Henrietta Cohen had been presented with such a plan, it would have been her "probate intent" [2] to effect the plan; and if so
> >
> > 2. Whether such plan provides the same benefits as the 1992 Will and Trust plan of Henrietta Cohen to the beneficiaries named therein; and if so
> >
> > 3. Whether such plan will actually generate sufficient surplus funds to ensure that all beneficiaries under the 1992 Will and Trust will receive the same benefits and to permit the Court to consider the appropriateness of allowing such surplus or extra funds to be applied for the benefit of Jacqueline Cohen as provided in the proposed plan.

In December 1998, Howard and Alan executed and filed a stipulation of dismissal with prejudice as to the first four counts of Howard's counterclaim and Alan's cross-claim. Howard filed a

---

[2] Apparently, the court meant *"probable* intent."

motion for reconsideration of the judge's order denying his motion to enforce the settlement agreement on the grounds that the basis for the court's denial of that motion, the dispute between Alan and Howard, had been resolved.

Rather than conducting oral argument on April 12, 1999, the return date of that motion, the judge convened a second settlement conference among all parties and counsel. According to Howard, after two days of negotiating, the parties reached a second agreement, which contained slightly different terms to settle the entire litigation; they agreed to return to the courthouse the following day to put their settlement on the record and to consider minor revisions to which they had agreed during the course of negotiations on April 13, 1999. However, according to Howard, when the parties returned to the courthouse the following morning to review the revised settlement documents prepared by Alan, Douglas announced that he was not prepared to go forward with the settlement agreement and that he intended to engage new counsel. Howard contends that Michelle did not object to the settlement agreement at that time.

Due to the differences of opinion among the parties regarding whether a settlement had been reached, an evidentiary hearing was scheduled for April 19, 1999. On that date, the judge and counsel engaged in further settlement negotiations in an effort to try to resolve the issues that arose after April 13. The parties and their counsel put the facts, but not the terms, of their agreement on the record. In response to questioning from their respective counsel, each party acknowledged on the record that the case had been settled subject to a review of the final document embodying the settlement.

By letter dated July 8, 1999, counsel for Howard advised the judge of problems that occurred in the interim and that there was no longer a consensus among the parties. He requested that the judge either enforce the April 13 settlement agreement or the April 19 revised agreement.

At the July 12, 1999 hearing, the judge heard argument from counsel for all of the parties, considered the written evidence documenting the purported settlement agreement, and heard testimony from the parties themselves. As a result of the judge's prior ruling, that Howard did not presently have standing to maintain an action to contest Henrietta's 1992 will and trust agreement and the stipulation between Howard and Alan, the only issue before the judge at that time was count five of Howard's counterclaim. Howard asserted in count five of his counterclaim that the testamentary documents did not adequately effectuate Henrietta's intent regarding the objects of her bounty, may have been executed when she was incompetent and subject to undue influence, did not effectuate maximum estate taxes, and requested authority to implement more appropriate testamentary and inter-vivos documents. The judge concluded that he was "satisfied the attorneys resolve[d] this matter," but that he still needed "to find out from the litigants whether they were involved in the process." He appointed Karen Jorgensen guardian ad litem for Michelle *nunc pro tunc* to the beginning of the litigation.

In response to the judge's questioning, Alan testified, in relevant part, as follows:

> I saw that the provision of having Mrs. Cohen's reserve funds introduce[d] into a family limited partnership scheme ... violated one of the provisions that there would not be a reduction of the reserve funds below I believe it was $500,000 and to do so in removing the material of the funds from the reserve fund and putting it in a family limited partnership, would automatically reduce the funds to below I think it was $480,000. So that put it below the $500,000 mark.

> * * * *

> I believe the history from the inception of this litigation, is this was done in some part for the protection of Henrietta Cohen and also protection of other family members and it was my position with my attorney, before accepting any settlement, that I did not want a settlement put together that was shoved down the throats of some members of the family or that they could not live with. And if that is the position of other members of the family that they cannot accept the terms of settlement and there's problems with it that Your Honor recognizes, I would also join in those objections.

Bruce also expressed concern regarding the settlement agreement. In response to the judge's inquiry, Bruce testified:

We engaged Baramar Supim who turned their entire tax department loose on it [FLP/LLP approach] and they came back with the analysis that, first of all, any premise, any idea that it was necessary to move money out [of] my grandmother's reserve share to effectuate or make viable the plan on the Howard Cohen side of the trust was completely without basis in law; that the partnership could be constructed in such a manner that no majority control was given to anyone who held a certain amount of finances. So the [sic] said that there was no real need to do that. And my recollection, Your Honor, is that that plan to move that $300,000-and-some out of my grandmother's reserve share and place it at somewhat greater jeopardy or place us also at somewhat greater jeopardy of being—having to carry the lion's share of my grandmother's maintenance, that that was unnecessary and it surfaced afterwards.

Douglas expressed his concerns and doubts regarding the settlement plan. As far as he was concerned, he did not believe the case was settled.

THE COURT: Mr. Doug Cohen, I neglected to ask you, you had also reported this case was settled. What was your understanding of that settlement?

MR. D. COHEN: I believe that we had an agreement in principal that we all wanted—but it was very preliminary in that terms were going to be—later. I know we discussed terms but I had no way to realize that I was committing to anything.

Additionally, as he indicated in response to Mr. Heuisler, he did not feel his interests were protected.

Q   Were you advised that, in calculating Jacqueline Cohen's share upon Howard's death, the distributions that were made to you and to your sister prior to the death of Howard, would be added for the purpose of evaluating your trust interest but would not be added back to Howard's trust in evaluating his trust—

A   No. There's a lot of things that are unclear about that issue and things that were represented—to us.

Q   Were you advised that if Howard Cohen, in fact, reduced the value of his trust below the $555,000 minimum, which is being required under this agreement, that monies could be taken from yours and your sister's trust in order to make up that difference and get her the minimum?

A  No. Certainly not. I actually—I was confused by this but I felt that one-third, one-third, one-third was—didn't include my sister and my cousin. At any point, I thought that that was just on Howard's death and this trust would be divided—

Karen Jorgensen responded "no" to the judge's inquiry regarding whether she believed the matter was settled. Ms. Jorgensen indicated that neither she nor Michelle was certain of the implica-

tions of the "settlement plan." Ms. Jorgensen testified as follows in response to Mr. Heuisler's questions:

Q During the course of all of these negotiations and discussions back and forth, both—well, were you ever advised that Jacqueline Cohen's guarantee of $555,000 paid regardless of the amount remaining in Howard's trust at the time of his death and that that could require a contribution from your daughter's and your son's trust which would make up that guaranteed minimum?

A No.

Q [W]ere you advised that if Henrietta dies within three years of the gifts, and if the discounts are disallowed by the IRS, that your children will receive less under this settlement than they would receive under the 1992 estate documents?

A Yes.

Q Okay. Were you advised that in calculating Jacqueline's share upon Howard's death, that distributions made to your two children prior to his death would be added back in to their trust for the purpose of evaluating and doing the one-third calculation while distributions made to Howard prior to his death would not be added back in?

A I was not advised of that.

* * * *

Q Were you advised that if the gift taxes are paid based upon the discounted values for gifts to the FLP or the LLC, and if the IRS disallows these discounts, that there will be interest and penalties as well as additional taxes assessed?

A I was not advised of that.

Q Were you aware that no reserves are set up in any of these documents for purposes of those potential additional taxes?

A I was not aware of that.

Q Were you advised that the plan does not specify who will pay any estate tax with respect to Howard's general power of appointment over a portion of the Howard trust?

A I was not—that was not discussed with me.

## The judge made the following findings:

I've listened to the representations of Ms. Jorgensen and Mr. Cohen. This is an extremely complicated area and I am satisfied for reasons I'm about to lay out, that both of these parties agreed to settle this matter when we were last in court and, in fact, reported the matter as settled. Oft times, I make this observation generally, oft times when matters are this complicated, a client does not expect and does not intend to settle the matter only with a complete understanding of the workings of the tax code, often leaving that to the attorney for the best deal possible and then agreeing or authorizing the attorney [to] enter into a settlement as that attorney feels appropriate.

I don't know whether that occurred here. I suspect it probably did but I'm certainly not making that finding. I am satisfied, however, that as Douglas Cohen indicated when he was in court, he thought that they had come to an agreement in principle and I take that to be essentially what Ms. Jorgensen had said. The workings of that principle are laid out in the agreement. The real problem here, I think, is an ultimate change of mind that we don't want to take a chance now that IRS might disallow this agreement although it seems to me that the only real adverse effect on that is the utilization of some of the monies which would otherwise go to Douglas and Michele during the life time of Jacqueline. I used the first names because there's too many Cohens. Otherwise, without any disrespect meant.

I'm satisfied when this matter was last in court, all these parties agreed that this matter would be appropriately settled on the terms which I have laid out and I will enforce that settlement.

The judge entered an order dated August 11, 1999, which is the subject matter of this appeal. In his order the judge retained jurisdiction "for the purpose of interpretation of this Order and the effectuation of the annexed Settlement Agreement." Similar to the 1992 testamentary plan, the settlement agreement enforced by the court provides for the division of Henrietta's estate in equal shares between Charles' side of the family and Howard's side of the family. Unlike the 1992 documents, however, the terms of the settlement agreement, as they relate to this appeal, are the following. First, Henrietta's 1992 trust agreement is revoked. Second, there is an immediate division of Henrietta's estate, prior to her death, into equal family shares and the immediate gifting of large portions of the estate to the beneficiaries under the 1992 trust agreement. Specifically, the principal part of the fifty-percent share going to the Howard part of the family will be placed in a Family Limited Partnership or Limited Liability Company. Interests or shares in that entity are gifted in trust by Henrietta's guardian on her behalf to trusts for the benefit of Howard, Michelle, and Douglas in the same relative percentages as in Henrietta's 1992 plan, but with the hope that the IRS will discount the value of the shares or interests for gift tax purposes. Third, a distribution is authorized to Jacqueline, who was implicitly excluded under the 1992 documents as a beneficiary of Henrietta's estate. Fourth, approximately $1.4 million of Henrietta's

estate is left in reserve in the two family shares to provide for the continuing comfort, maintenance, and welfare of Henrietta.

The provision of the settlement agreement, which Michelle challenges in this appeal, provides for the creation of a Qualified Terminable Interest Property ("Q–Tip") trust established for Jacqueline's benefit during her life, if she survives her husband Howard. Upon Howard's death, instead of the funds in Howard's trust being divided between the trusts for Douglas and Michelle, Jacqueline is guaranteed a trust for her benefit in the minimum amount of $555,000 and in a potentially greater amount, depending upon the balance in the Howard trust at the date of his death. Jacqueline has the immediate right to withdraw $250,000 outright from her trust and to receive annual distributions during her lifetime. Upon Jacqueline's death, the balance remaining in her trust will be paid to the Douglas and Michelle trusts.

## II

Michelle argues that there was no settlement to be enforced in this matter since there was a lack of agreement on material terms. Moreover, she submits that even if a settlement were reached, the Howard plan is an impermissible alteration of Henrietta's testamentary plan and an impermissible gifting plan and should not be enforced by the court. Howard claims that the Q-tip trust for Jacqueline was the subject of specific and intense negotiations that resulted in a compromise agreement among all the beneficiaries of Henrietta's estate, who were all represented by counsel throughout the litigation. Howard argues that Michelle and Douglas voluntarily waived their right to a hearing when Douglas and Karen Jorgensen, on Michelle's behalf, acknowledged their voluntary consent to the agreement on the April 19, 1999 record. Additionally, Howard claims that the October 23, 1998 order contemplated and set forth the schedule for and issues involved in resolving the motion to approve the Howard plan, which was contested at the time. He concludes that the need for an evidentiary hearing to address the gifting and financial plan

was obviated by the settlement plan. Finally, Howard argues that the parties' settlement agreement, which the trial judge determined was reached, included an implicit agreement among the parties that Henrietta would have approved the settlement agreement if it was presented to her at a time when she was competent. We disagree with Howard's position.

The concerns expressed by Douglas, Michelle's guardian ad litem, and other family members about the substance of the settlement plan at the July 12, 1999 hearing suggest an absence of a meeting of the minds but are not entirely dispositive of whether the judge appropriately enforced the settlement agreement. Even if there was an agreement among all the beneficiaries respecting pre-mortem reformation of Henrietta's testamentary plan, the judge would still have been obligated to conduct the second evidentiary hearing to determine whether the revised financial and gifting plan was in Henrietta's best interest and consistent with Henrietta's intent under *In re Trott*, 118 *N.J.Super.* 436, 288 *A.*2d 303 (Ch.Div.1972).

Contrary to the law and the judge's October 23, 1998 order, no evidentiary hearing was held regarding the appropriateness of implementing a new testamentary plan and, therefore, no judicial inquiry into Henrietta's probable intent was ever made. The hearing of July 12, 1999 was held solely for the purpose of determining whether another settlement was reached, even though that settlement itself called for the implementation by Henrietta's guardian of a new testamentary plan. Thus, despite his earlier holding that before a new plan could be implemented Henrietta's probable intent had to be established, the trial judge enforced the later settlement plan without any fact-finding to support the pre-mortem modification of Henrietta's deliberate testamentary plan. Moreover, the judge did not make a finding regarding whether the settlement plan provided the same benefits as Henrietta's 1992 testamentary plan or whether the settlement plan would actually generate sufficient tax savings to justify granting Jacqueline such an extra benefit. As the judge explained

in his denial of Michelle's request for a stay of his decision, he accepted the proposition that Michelle and Douglas would receive the same amount under the settlement agreement as they would under the will, while providing for Jacqueline. Specifically, he said, "that was the only basis that I determined that I had the authority to enforce this kind of plan." We find this to be an inadequate justification for enforcing the settlement agreement. The mere fact that Michelle and Douglas may have benefitted from the plan and perhaps, at some point, even consented to the minimum funding provision for Jacqueline does not mean that such a plan would have been Henrietta's probable intent. A potential settlement among the beneficiaries of Henrietta's estate does not supplant the need for the court, as final arbiter and guardian of the incompetent, to independently determine whether it would have been Henrietta's probable intent to effectuate such a plan. *See Trott, supra,* 118 *N.J.Super.* at 440–441, 288 *A.*2d 303. (conducting an independent valuation of the proposed plan even though the proceeding was jointly initiated by guardian of incompetent and the sole apparent next of kin and heirs at law).

## III

The judge assumed a herculean task in managing this case, and it is apparent from his October 23, 1998 order that he recognized the need for a judicial examination into Henrietta's probable intent. We find, however, that he erred in omitting the second step. He did not conduct the evidentiary hearing and make findings with regard to the *Trott* factors before authorizing Henrietta's guardian to implement Howard's settlement plan. Moreover, he failed to determine whether he was satisfied under *N.J.S.A.* 3B:12–50, that it was "in the best interests" of Henrietta to authorize the gifts contained in the settlement agreement. Furthermore, although the court has the authority to approve pre-mortem gifts, trusts and other transfers for incompetents in certain circumscribed situations, we find that such circumstances

do not exist in this case. Accordingly, we reverse the judge's determination.

"The common law equitable doctrine of substituted judgment encompasses the view that a court has inherent power to deal with the estate of an incompetent in the same manner as the incompetent would if [he or she was] able to function at full capacity." *In re Labis,* 314 *N.J.Super.* 140, 146, 714 *A.*2d 335 (App.Div.1998). The doctrine was applied in *Trott, supra,* which held that, under the doctrine of *parens patriae,* the court may intervene in the management and administration of an incompetent's estate for the benefit of the incompetent or the estate. 118 *N.J.Super.* at 440, 288 *A.*2d 303. In that case, the court permitted a guardian bank to make inter-vivos gifts to the eighty-five year-old incompetent's grandchildren, the sole heirs under her will, for "the principal if not the sole reason ... [of] the possible saving of death taxes." *Id.* at 439, 288 *A.*2d 303. The court set forth a cogent five-part analysis to determine whether to authorize such gifts from the incompetent's estate, considering whether:

(1) the mental and physical condition of the incompetent are such that the possibility of her restoration to competency is virtually nonexistent; (2) the assets of the estate of the incompetent remaining after the consummation of the proposed gifts are such that, in the light of her life expectancy and her present condition of health, they are more than adequate to meet all of her needs ...; (3) the donees constitute the natural objects of the bounty of the incompetent ...; (4) the transfer will benefit and advantage the estate of the incompetent by a reduction of death taxes; (5) there is no substantial evidence that the incompetent, as a reasonably prudent person, would, if competent, not make the gifts proposed in order to effectuate a saving of death taxes.

[*Id.* at 443–44, 288 *A.*2d 303 (footnotes omitted).]

Title 3B of the New Jersey statutes has expanded the power previously available to the courts and guardians under prior case law such as *Dufford v. Nowakoski,* 125 *N.J.Eq.* 262, 4 *A.*2d 314 (E. & A.1939), *aff'd on reargument* 126 *N.J.Eq.* 529, 9 *A.*2d 302 (E. & A.1939). The courts are now statutorily authorized to make gifts, as they were not when *Trott* was decided, but the *Trott* qualifying criteria governing when a court should exercise that power are still applicable. *See In re Labis, supra,* 314 *N.J.Super.* at 147, 714

*A.2d* 335 (authorizing a wife as guardian for her incompetent husband to make an interspousal transfer of her husband's interest in the marital home as a Medicaid planning measure). *Labis* further explained that "Title 3B of New Jersey Statutes has incorporated the concepts of *Trott.*"

> *N.J.S.A.* 3B:12–49 provides, in pertinent part:

> The court has, for the benefit of the ward, his dependents and members of his household, all the powers over his estate and affairs which he could exercise, if present and not under a disability, except the power to make a will, and may confer those powers upon a guardian of his estate. These powers include, but are not limited to power to ... create revocable or irrevocable trusts of property of the estate which may extend beyond his disability or life ...

*N.J.S.A.* 3B:12–50 permits the court "to make gifts in trust or otherwise, or to change beneficiaries under insurance and annuity policies, only if satisfied, after notice and hearing, that it is in the best interests of the ward." *N.J.S.A.* 3B:12–58 provides:

> If the estate is ample to provide for the purposes implicit in the distributions authorized by this article, a guardian for the estate of a mental incompetent may apply to the court for authority to make gifts to charity and other objects as the ward might have been expected to make.

Furthermore, *N.J.S.A.* 3B:12–62 provides that "in selecting assets of the estate for distribution under this article, ... and other powers exercisable by the guardian or a court, the guardian or the court should take into account any known estate plan of the ward, including his will, [and] any revocable trust of which he is settlor...."

Henrietta, who is still alive, although incompetent, prepared a detailed testamentary plan, including a 1992 trust and pour-over will. Her plan was deliberate and carefully crafted, recognizing that it may lead to additional death and transfer taxes. Her intention in creating the Howard trust was to keep the benefits of her estate away from his new wife, Jacqueline, and to protect her grandchildren, Douglas and Michelle. As certified by Ronald Wagenheim, her longstanding attorney who drafted the documents:

> 4. Between 1983 and 1994, I met with Mrs. Cohen on many occasions and discussed her wishes and desires with regard to her estate plan. During those

visits, I had an opportunity to explain to her various estate planning techniques, including Charitable Remainder Unitrust, GRAT, and other similar types of estate tax saving techniques. She had a consistent problem with each of the plans proposed, all of which related to her perceived loss of control over the assets. Notwithstanding my explanation that her financial position would never be in jeopardy, she rejected these proposals.

The meetings referred to above culminated in the development of her Last Will and Testament and the Trust Agreement dated August 4, 1992. . . .

5. There is no question in my mind that the terms contained in Mrs. Cohen's Last Will and Testament and Trust Agreement reflect her exact decisions and intentions regarding her estate plan. The decisions were deliberate and well-thought out by her. In particular, she insisted that the portion of her estate which was to be distributed to her son, Howard, should be left in trust for him during his lifetime. I explained to her that such an arrangement would create substantial additional generation-skipping taxes and that it would most inevitably lead to a division between her family members. I told her that it was not a common practice to leave a trust for any person who was already over the age of 65 years. She insisted that I retain that provision in the Will for his protection and most importantly, for the protection of her grandchildren *to the exclusion of his new wife.*

6. After the documents were signed, I received a letter from Alan Cohen indicating that he objected to the placement of a Trust over Howard Cohen's share of the estate. Alan Cohen indicated in the letter that he felt that the Trust would cause family disharmony and division. . . .

7. After receiving Alan Cohen's letter, I discussed his concerns in detail with Mrs. Cohen on the telephone. Mrs. Cohen remained firm that the Trust over Howard Cohen's share of the estate was designed to insure that Mrs. Cohen's grandchildren received the remainder of the share held in trust for Howard. *Mrs. Cohen was concerned that if Howard Cohen's share of the estate were left to him outright that his wife might ultimately receive his wealth as opposed to Mrs. Cohen's grandchildren. Mrs. Cohen further advised me that her desire to protect the Cohen family wealth from Howard Cohen's wife outweighed the possibility that the Trust provisions would create family disharmony.* I reported the substance of my telephone conversation with Mrs. Cohen in a contemporaneous memorandum dated August 20, 1992. . . .

8. In late 1996 I visited Mrs. Cohen at the Linwood Convalescent Center after being made aware by Albert F. McGee, Jr., Esquire that she had reportedly requested to make changes to the estate planning documents. During that visit, it was obvious to me that Mrs. Cohen had suffered a substantial loss of memory and did not fully comprehend any proposed changes to her estate plan.

[Emphasis added.]

Furthermore, as Alan stated in his certification, Henrietta "did not like Jackie Cohen and expressed again openly the concern that Dr. Cohen and his wife could not be trusted to make sure Dr.

Cohen's children would receive an inheritance and would be cared for." Bruce concurred:

> Embarrassingly, my uncle [Howard] is estranged from everyone in our family, including his own children and his only two nephews. These traits of my uncle were recognized by my grandmother long ago in the manner in which she prepared her testamentary plan which provided for him, but did not divert his inheritance away from his own children.

Title 3B authorizes trusts, inter-vivos gifts, and other distributions, not sweeping changes to an incompetent's testamentary plan that do not satisfy the last three qualifying criteria of *Trott:*

> (3) the donees constitute the natural objects of the bounty of the incompetent ...; (4) the transfer will benefit and advantage the estate of the incompetent by a reduction of death taxes; (5) there is no substantial evidence that the incompetent, as a reasonably prudent person, would, if competent, not make the gifts proposed in order to effectuate a saving of death taxes.
>
> [*Trott, supra,* 118 *N.J.Super.* at 443-44, 288 *A.2d* 303 (footnotes omitted).]

Moreover, the proposed changes are not in Henrietta's "best interests" under *N.J.S.A.* 3B:12-58 and are not to "other objects as the ward might have been expected to make" under *N.J.S.A.* 3B:12-58. Contrary to Henrietta's testamentary plan, Howard's settlement plan revokes Henrietta's trust and distributes a substantial portion of her estate before her death. The principal purpose of the revision to Henrietta's testamentary plan was not to reduce gift and death taxes, but for Howard to have more control over the funds to be held in trust for him and to obtain a benefit for his wife Jacqueline. As Leonard Goldberg, the court-appointed tax expert explained in his April 24, 1998 report to the court:

> I see no basis for creating a Q-tip Trust for the benefit of Jacqueline Cohen in the amount of $555,000. As a "tax-savings measure", this makes no sense. The maximum amount of Generation Skipping Transfer Tax payable even if there are no valuation discounts would be $117,703.... Assuming that Jacqueline survives Howard by twenty (20) years, the cost of deferring the receipt for twenty (20) years of $555,000 would be $437,000 assuming an 8% present value rate....

The settlement agreement alters the substance of the will and authorizes a large distribution to someone who is not an object of Henrietta's bounty as expressed in her will. After a review of the court records, Goldberg concluded that he found no evidence that Jacqueline was an object of Henrietta's bounty. He

recognize[d] that annual exclusion gifts of $10,000 have been made to her in the same manner as have been made to spouses of other issue; however, I infer from that Henrietta desired to augment her gifts to her issue by making gifts to the spouses of her issue as well as to her issue. In my judgment, this evidenced a desire to benefit the issue (and only indirectly the spouses) and not to directly benefit the spouse as an object of Henrietta's bounty.

Moreover, there is strong evidence in the record that including Jacqueline in the will is contrary to Henrietta's clear testamentary intent and that she would not have adopted such an alternative plan. We will not enforce the purported settlement agreement because that would result in an improper modification of Henrietta's estate plan.

We reverse and remand without prejudice to any of the parties proposing alternative plans within sixty days, consistent with the principles set forth in this opinion. We agree with the Chancery Division judge's ruling that it would be premature for any party to contest Henrietta's will and trust while she is alive.

Reversed and remanded.