811 A.2d 942 (2002)
356 N.J. Super. 170
In the Matter of Mildred KERI, a Mentally Incompetent Person.
Superior Court of New Jersey, Appellate Division.
Submitted November 13, 2002.
Decided December 19, 2002.
Donald D. Vanarelli & Associates, attorneys for appellant Richard Keri (Donald D. Vanarelli, of counsel and on the brief; Whitney W. Bremer, Westfield, on the brief).
Before Judges STERN, COBURN and ALLEY.
The opinion of the court was delivered by
COBURN, J.A.D.
Plaintiff, Richard Keri ("Richard"), sued in the Chancery Division to be appointed guardian of the person and property of his mother, Mildred Keri ("Mildred"), a mental incompetent. Relying on the doctrine of "substituted judgment," he sought permission to engage in "Medicaid planning" on "her" behalf. Mildred's major asset is her home, where she now resides, and where she would like to remain. In essence, Richard's plan was to sell Mildred's home; put her in a nursing home that accepts Medicaid patients; take $92,000 of the proceeds from the sale as a gift (to be shared equally with his brother), and leave her about $78,000, which would be sufficient to pay for her nursing home care during the period of Medicaid ineligibility resulting from the gift. The Chancery judge granted the guardianship application, ordered the sale of Mildred's home and her placement in a nursing home, but refused to authorize the Medicaid plan. We affirm the denial of Medicaid planning, reverse the order requiring sale of the *943 home and nursing home placement, and remand for further proceedings.
The facts were developed in a brief trial: Richard testified, and certifications were submitted from three medical experts attesting to Mildred's permanent, mental incompetence. Richard's brother, Charles, was present and did not object to the proposal. Mildred was "represented" by a court-appointed attorney, who offered no evidence, declined to cross-examine Richard, and supported the application in all respects.
Mildred is eighty-eight years old and lives alone in her own home in New Brunswick. Her home is worth about $170,000; her income, from Social Security and a pension, is $1,575.45 per month. According to the expert certifications, dementia has "impaired her physical and cognitive abilities so that she is no longer able to adequately provide for her own safety and welfare." She is "highly vulnerable to abuse, exploitation, and the adverse health effects of neglect in her current circumstances...." She is entirely dependent on the care provided by her sons, who alternate daily visits. Neither son has any extraordinary need that might be met or ameliorated by receiving a portion of his mother's estate. She has refused her sons' offers to live with either of them, preferring to remain in her own home. Her condition has worsened over time, placing her in increased danger. Her will leaves her estate equally to her two sons. In 1996, she executed a general power of attorney naming Richard as her agent; although that instrument authorized him to apply for Medicaid on her behalf, it did not provide for him to make gifts on her behalf to himself or anyone else, either to qualify her for Medicaid or for any other reason.[1] Richard testified that his research of nearby nursing homes showed that the monthly costs would be between $6,000 and $6,500 per month. After taking $92,000 from the sale of Mildred's home as a gift for himself and his brother, about $78,000 would be left, which, together with Mildred's income, would be enough to pay for nursing home care for seventeen months, the period of Medicaid ineligibility resulting from the gifts. He did not explore in-home care under Medicaid or otherwise.
Medicaid "is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services." Atkins v. Rivera, 477 U.S. 154, 156, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131, 137 (1986). The federal government reimburses participating states which comply with federal guidelines. L.M. v. Div. of Med. Assistance & Health Serv., 140 N.J. 480, 484, 659 A.2d 450 (1995). Medicaid is intended to be a funding of last resort for those in need. N.J.S.A. 30:4D-2.
To be eligible for Medicaid in New Jersey based on age, a person must be a resident of this state, at least sixty-five years old, a United States citizen or an eligible alien, and not have available resources beyond $2,000 per month. N.J.A.C. 10:71-3.2, -3.4, -3.0, and -4.5(b). A person's home is excluded as an asset so long as it is the place of principal residence of the applicant or a spouse. N.J.A.C. 10:71-4.4. However, if the person is unlikely to return to the home, the state may impose a lien on the property to obtain reimbursement of benefits provided. 42 U.S.C.A. § 1396a(1)(B).
*944 To discourage applicants from disposing of assets for the sole purpose of becoming eligible for Medicaid, all property transfers for less than fair market value and made within thirty-six months before the application are scrutinized. 42 U.S.C.A. § 1396p(c)(1)(B)(i); N.J.A.C. 10:71-4.10(a). Although such transfers are presumed to be improperly motivated, the presumption is rebuttable. N.J.A.C. 10:71-4.7(h)(2). If the presumption is not rebutted, the person will be ineligible for Medicaid for up to thirty months. N.J.A.C. 10:71-4.7(b)(4). The precise period of ineligibility is calculated by dividing the amount transferred for less than fair market value by the state's average monthly nursing home cost ($5,540 as of May 2000, according to N.J.A.C. 10:71-4.10(m)(1)), but may not exceed thirty months. Ibid. These are commonly referred to as "look-back" rules.
"Medicaid Planning" in this context has been described euphemistically by a New York court as "the transferring of assets to permit an individual to become Medicaid-eligible for the cost of nursing home care while enabling him or her to preserve some of his or her assets for the next generation." In re Daniels, 162 Misc. 2d 840, 618 N.Y.S.2d 499, 500 (Sup.Ct.1994). And New York's Appellate Division, although recognizing "that the Medicaid program was not designed to provide benefits to those who render themselves `needy' through the use of [such] plans," nonetheless described such planning as "prudent." In re John XX, 226 A.D.2d 79, 652 N.Y.S.2d 329, 331-32 (App.Div.1996), leave to appeal denied, 89 N.Y.2d 814, 659 N.Y.S.2d 854, 681 N.E.2d 1301 (1997).
Putting euphemisms to one side, the plan, if followed by a competent person, is nothing other than self-imposed impoverishment to obtain, at taxpayers' expense, benefits intended for the truly needy. That is why the Supreme Court of Connecticut rejected a similar Medicaid scheme, while observing that its "conclusion reflects the legislative concern that the medicaid program not be used as an estate planning tool. The medicaid program would be at fiscal risk if individuals were permitted to preserve assets for their heirs while receiving medicaid benefits from the state." Forsyth v. Rowe, 226 Conn. 818, 629 A.2d 379, 385 (1993); accord Williams v. Kansas Dep't of Social and Rehabilitation Servs., 258 Kan. 161, 899 P.2d 452 (1995); Ronney v. Dept. of Soc. Serv., 210 Mich.App. 312, 532 N.W.2d 910 (1995). Nonetheless, a competent individual may engage in such planning, subject to the penalties described above. The question for us to resolve is whether it should be permitted by a guardian for the benefit of an incompetent's self-sufficient, adult children.
Originally, our jurisdiction to resolve questions of this nature derived from the principle of parens patriae, which requires that courts be "zealous [in] safeguard[ing] the personal and property rights of incompetent parties . . . ." East Paterson v. Karkus, 136 N.J. Eq. 286, 289, 41 A.2d 332 (Ch.1945); accord Johnson v. State, 18 N.J. 422, 430, 114 A.2d 1 (1955). Applying that principle, a trial court determined that even without statutory authority, the power to permit a guardian to make gifts on behalf of a ward "inheres in a court of chancery by virtue of its position as protector and general guardian of all persons under disability." In re Trott, 118 N.J.Super. 436, 440, 288 A.2d 303 (Ch.Div.1972). At issue was whether a guardian could make gifts on behalf of a ward to decrease estate tax liability. Such gifts were found to be permissible if they met the following criteria:
(1) the mental and physical condition of the incompetent are such that the possibility of her restoration to competency is *945 virtually nonexistent; (2) the assets of the estate of the incompetent remaining after the consummation of the proposed gifts are such that, in the light of her life expectancy and her present condition of health, they are more than adequate to meet all of her needs in the style and comfort in which she now is (and since the onset of her incompetency has been) maintained, giving due consideration to all normal contingencies; (3) the donees constitute the natural objects of the bounty of the incompetent ...; (4) the transfer will benefit and advantage the estate of the incompetent by a reduction of death taxes; (5) there is no substantial evidence that the incompetent, as a reasonably prudent person, would, if competent, not make the gifts proposed in order to effectuate a saving of death taxes.

[Id. at 442-44, 288 A.2d 303.]
More recently, when reviewing an application to make gifts on behalf of an incompetent, we defined the governing principle as the exercise of "substituted judgment," In re Labis, 314 N.J.Super. 140, 146, 714 A.2d 335 (App.Div.1998), and we adopted the Trott criteria as the guiding standards for such determinations, id. at 147, 714 A.2d 335. Accord In re Cohen, 335 N.J.Super. 13, 29, 760 A.2d 1128 (App.Div. 2000). Our authority in this regard has been endorsed by the Legislature, but "only if [the gift] is in the best interests of the ward." N.J.S.A. 3B:12-50. We took note of that statute in Labis, 314 N.J.Super. at 147, 714 A.2d 335, and in Cohen, 335 N.J.Super. at 30, 760 A.2d 1128.
"Substituted judgment" is a complex principle with variable meaning depending on the context. Thus, in Trott, where the goal was avoidance of estate taxes by gifts to the natural objects of the incompetent's bounty, the court limited approval of such gifts to circumstances where the gifts would not adversely affect the incompetent's life-style, and where "there is no substantial evidence that the incompetent, as a reasonably prudent person, would, if competent, not make the gifts proposed in order to effectuate a savings of taxes." Trott, 118 N.J.Super. at 443-44, 288 A.2d 303. In other words, even if the proposed gift was reasonable, it would not be approved if the incompetent had indicated a contrary intent. Thus, when the object is avoidance of estate taxes, "substituted judgment" is an objective standard, provided the incompetent has not expressed a contrary, subjective intent. On the other hand, when the issue is an incompetent's right, through a guardian, to refuse life-sustaining treatment, the test may be either a purely subjective one, a limited-objective one, or a purely objective one, depending on the precise circumstances. In re Conroy, 98 N.J. 321, 360-67, 486 A.2d 1209 (1985). However, the Court clearly expressed a preference for resolution of the issue by the subjective test, whenever possible, so as to be "consistent with the notion that the right that we are seeking to effectuate is a very personal right to control one's own life." Id. 360, 486 A.2d 1209.
In Labis, the court was directly concerned with Medicaid planning on behalf of an incompetent in need of long-term nursing home care; but the beneficiary of the proposed gifts was the incompetent's needy wife of twenty-seven years, and the gifts (half of $100,000 plus the incompetent's undivided one-half interest in the marital home), if made by the husband before he became incompetent, would not have been subject to the "look-back" rules. 314 N.J.Super. at 144-45, 714 A.2d 335. In that circumstance, the court applied what might be described as the limited-objective test of Trott. In other words, absent the incompetent's expressed contrary *946 intent, the court would permit the gifts to the natural object of his bounty, as set forth in his last will. Id. at 148, 714 A.2d 335.
The limited-objective test of Trott, makes sense when the goal is saving on estate taxes. Moreover, that goal is not inconsistent with one's obligations as a citizen. As Judge Learned Hand has observed, "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir.), aff'd, 293 U.S. 538, 55 S.Ct. 82, 79 L.Ed. 645 (1934) (citations omitted).
But application of the limited-objective test to Medicaid planning is troublesome. While there is no moral duty to increase one's taxes, many people might well be reluctant to become wards of the state by unnecessary self-impoverishment, even if that course would benefit their children. In short, Medicaid planning in this context poses a moral and personal dilemma:
Many elderly people, ... are reluctant to apply for Medicaid, even when ... it makes sense to do so. After a lifetime of self-sufficiency they feel humiliated to have to turn to the government for help.
[Claire Berman, Caring for Yourself While Caring For Your Aging Parents 133-34 (Owl Books, Henry Holt and Company, 2d ed.2001).]
For some people, protecting assets and then going on Medicaid raises troubling moral questions. Medicaid and other public programs certainly are not intended to protect anyone's inheritance or extra spending money; they are meant for those who are truly needy. What your parent saves, taxpayers pay.
Your family has to be guided by its own moral and political code on this matter. Some people argue that whatever money an older person has should be spent on making his last years as comfortable as possibleit should not be protected for his childrenand that receiving public assistance is demeaning. Others believe that using public monies when personal funds are available is criminal.
A third group contends that lifelong taxpayers who believed they were sufficiently covered by Medicare and were not offered adequate long-term care insurance (because until recently, it didn't exist) are justified in protecting whatever assets they can. Affluent people set up trusts to protect their estates from taxes, so why shouldn't people with smaller estates protect themselves from nursing home bills? The decision is up to your family. Familiarize yourself with the facts and do what's right for you.
[Virginia Morris, A Complete Guide, How to Care For Aging Parents 263 (Workman Publishing 1996).]
Nonetheless, some courts in other states, when faced with plans similar to the one proposed here, use a purely objective test. See In re Shah, 257 A.D.2d 275, 694 N.Y.S.2d 82, 86-87 (1999); aff'd, 95 N.Y.2d 148, 711 N.Y.S.2d 824, 733 N.E.2d 1093 (2000); In re John XX, supra, 652 N.Y.S.2d at 331-31; In re Guardianship of F.E.H., 154 Wis.2d 576, 453 N.W.2d 882 (1990); and Rainey v. Mackey, 773 So.2d 118 (Fla.Dist.Ct.App.2000). Thus, for example, in In re John XX, the New York court held that when a person "will require nursing home care, the cost of which will exhaust his [or her] assets, it cannot be reasonably contended that a competent, reasonable individual in his [or her] position would not engage in ... Medicaid planning [involving transfer of the assets to his or her children.]" 652 N.Y.S.2d at *947 331. By contrast, the Connecticut Supreme Court has observed that it did not "believe that federal law requires a presumption" that a person would have so acted. Probate of Marcus, 199 Conn. 524, 509 A.2d 1, 7 (1986).
In New Jersey, we have permitted Medicaid planning, but so far only when the beneficiary is the incompetent's spouse. We did so in Labis, supra, and the Supreme Court followed the same course in L.M., supra, approving a guardian's decision to transfer the incompetent's pension to his ward's wife, as part of equitable distribution in a divorce case, so that the ward would qualify for Medicaid nursing home benefits. But even in L.M., the Court expressed concern about the effect of generally permitting the transfer of assets to obtain Medicaid, stating that the practice "would unfairly place a further burden on the limited resources of the State." 104 N.J. at 500, 517 A.2d 859.
Mildred's situation is different and distinguishable from that of the incompetents in L.M. and Labis: the proposed beneficiaries are her self-sufficient, adult children, not a needy spouse. Moreover, while incompetent, she was nonetheless able to express a desire to remain in her own home, an option her guardian did not pursue.
Without necessarily expressing any view with respect to which course is more commendable, we conclude that a competent and reasonable adult might or might not engage in this type of "Medicaid planning" for the benefit of adult, self-sufficient children. Indeed, a competent and reasonable adult might expect that if he or she became incompetent, the children would select the best nursing home for their parent's comfort while avoiding premature application for welfare. Moreover, preserving Mildred's assets for nursing home care may well be important to insure the best care possible within her means. As noted above: "If your parent has savings enough to cover at least six months of nursing home care, and preferably more he will have a far better chance of being accepted in the home of his choice." Morris, supra, at 263 (emphasis added).
Therefore, when the incompetent has not indicated a preference for Medicaid planning while competent, we will not prematurely force enrollment on the public dole at the guardian's request for the benefit of the incompetent's self-sufficient children. A purely subjective standard is called for in this context to protect the incompetent's right to self-determination. Since the evidence in this case provides no support for the course proposed by the guardian, we affirm this aspect of the judgment.
One other point deserves comment. Unlike the situation involving spouses, there is a greater likelihood of conflict of interest when the gift-beneficiaries are children. As the Florida court observed in Rainey, supra: "Courts must make room for the possibility that some children may try to pressure vulnerable parents into divesting themselves of assets so that the estate is not depleted by the costs of nursing home care." 773 So.2d at 122.
In this case, the trial court dealt with that possibility by appointing an attorney to represent the incompetent pursuant to R. 4:86-4(b). As we have noted, the attorney's participation in this case was minimal (including his failure to file a brief on the appeal), and the record lacks any indication that the attorney had the requisite expertise for so sensitive a matter.
Absent extraordinary circumstances, a court faced with an application of this nature should appoint the Public Guardian to represent the incompetent under the Public Guardian For Elderly *948 Adults Act, N.J.S.A. 52:27G-20 to -31. Since we are concerned about whether Mildred's best interests are being protected in this case, both with respect to whether she must be placed in a nursing home, see Home Care Services, N.J.A.C. 10:60-1.1 to 11.2, and, if so, the quality of the nursing home, we remand the case to the trial court with the direction that it ask the Public Guardian to intervene on Mildred's behalf pursuant to N.J.S.A. 52:27G-25h.
Affirmed in part; reversed in part; and remanded for further proceedings consistent with this opinion.
NOTES
[1] See State v. Kennedy, 61 N.J. 509, 512, 296 A.2d 65 (1972), and D'Amato by McPherson v. D'Amato, 305 N.J.Super. 109, 115, 701 A.2d 970 (App.Div.1997), both holding that a general power of attorney does not authorize gifts of the principal's assets.