877 A.2d 1218

H.K., PETITIONER–APPELLANT, v. STATE OF NEW JERSEY, DE-
PARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL
ASSISTANCE AND HEALTH SERVICES, RESPONDENT–RE-
SPONDENT, AND ATLANTIC COUNTY DEPARTMENT OF HU-
MAN SERVICES, RESPONDENT.

Argued May 2, 2005—Decided July 21, 2005.

368

*Gerard W. Quinn* argued the cause for appellant (*Cooper Levenson April Niedelman & Wagenheim,* attorneys).

*Michael J. Haas,* Assistant Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Julie C. Hubbs,* Deputy Attorney General, on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

At age sixty-seven, H.K. applied for Medicaid assistance and was declared ineligible by the New Jersey Division of Medical Assistance and Health Services (DMAHS) because it determined that H.K. had transferred real property for less than fair market value within thirty-six months of the date that she applied (the "look-back" period). This appeal turns on whether DMAHS was correct as to when the real property transfer was effective for purposes of the look-back.

DMAHS concluded that the effective date of transfer was the date that the conveying deed was recorded, not the date that it was executed. The Appellate Division deferred to the agency's determination as DMAHS is the administrative agency responsible for deciding contested cases involving entitlement to Medicaid

benefits. We now reverse. Although DMAHS is entitled to deference in respect of its statutory expertise, that deference is unwarranted in this matter because DMAHS misapplied the law governing conveyances of real property.

## I.

This matter was the subject of several hearings in the Office of Administrative Law (OAL). We recite the facts developed in those proceedings as well as procedural twists and turns in the history of this administrative appeal.

H.K.'s father, L.O., died on May 22, 1996, and conveyed property located at 171 25th Street in Avalon (the Avalon property) to H.K. in his will. H.K. moved into the Avalon property in 1997, and was diagnosed with Alzheimer's Disease later that year.

On July 27 or 28, 1998, H.K.'s children, D.K., T.K., and T.K., met with Ronald Wagenheim, a tax attorney, to explore transferring the Avalon property into the children's names.[1] Wagenheim testified that the children wanted to discuss "the tax consequences associated with the transfer" of the Avalon property. The children consulted Wagenheim after they were told by H.K.'s sister that L.O.'s estate was subject to significant estate taxes upon L.O.'s death and that they should take steps to minimize the tax consequences that would flow from H.K.'s estate upon her demise. Wagenheim was retained to provide estate planning assistance to the family. As part of his representation of H.K., Wagenheim conferred with her about transferring the Avalon property, and reviewed her will, her existing power of attorney, and her need for a living will.

---

[1] One son, T.K., participated in the initial meeting, but otherwise was not an active participant in the history of this appeal. H.K.'s other son, T.K., and her daughter, D.K., took the lead in assisting with H.K.'s affairs and, therefore, feature prominently in the factual recital. The ultimate conveyance of the Avalon property was to all three of H.K.'s children.

After his initial consultation with the children, and in order to be sure that H.K. wished to transfer the property to her children, Wagenheim took two steps. He sent a letter to H.K. explaining that he had met with her children and detailing what they had discussed. At Wagenheim's request, H.K. signed and returned the letter, stating that she was "in agreement that [Wagenheim] should prepare a deed transferring [her] ownership in the [Avalon property] to [her] three children." Wagenheim also met with H.K. in person, outside the presence of her children, to determine whether H.K. truly intended to convey the property to her children and whether she was competent to do so. After satisfying himself in respect of both issues, Wagenheim prepared for H.K. a new power of attorney, a durable power of attorney, and a living will. Another attorney from his office prepared a deed to convey the Avalon property to H.K.'s children.

On July 30, 1998, H.K. executed the deed (the H.K. deed) conveying the Avalon property as a gift to her children. Wagenheim gave the deed to H.K.'s daughter, D.K., on August 3, 1998, with instructions to coordinate the filing of the H.K. deed with the filing of the deed from L.O.'s estate that granted the Avalon property to H.K. (the L.O. deed). Wagenheim instructed D.K. to add the recording information from the L.O. deed to the front page of the H.K. deed before she filed the H.K. deed for recording purposes. In a separate letter to H.K. on that same date, Wagenheim informed H.K. that the deed had not yet been recorded, but that "[a]s a matter of law, the transfer is complete as of July 30, 1998 and the recording is just further evidence of that fact as against other creditors or lienholders."

The next significant event occurred in November 1999, when H.K.'s son, T.K., telephoned the County Clerk's Office in Cape May County to inquire about recording the H.K. deed. He was informed that the L.O. deed had not been recorded and that the Avalon property had to be transferred into H.K.'s name before the deed transferring the property to H.K.'s children could be recorded. The children contacted their aunt, who was executrix of the

L.O. estate, and the attorney who was handling the L.O. estate, to obtain a copy of the L.O. deed for recording purposes. Eventually, the children received a copy of the deed from their aunt; however, its filing was overlooked. Due to miscommunication between T.K. and D.K., each thought the other had filed the deed. T.K. testified that he "may have forwarded" the deed to his sister, or he may have been the one that "dropped the ball;" but, what is certain is that he was unaware of what happened to the deed at that point in time. D.K. also admitted that the deed apparently "got misplaced or misfiled," leading her "at one point [to think that her] brother was handling it, [while] he thought [she] was handling it."

Sometime in July 2000, D.K.'s husband stumbled across the L.O. deed lodged between pages of a cookbook in the Avalon property. Realizing then that the L.O. deed had not been recorded, H.K.'s children had D.K.'s husband bring the deed to the Cape May County Clerk's Office for recording only to have it rejected for lack of a proper acknowledgement and an Affidavit of Consideration. They sent the L.O. deed back to the attorney handling L.O.'s estate who, in turn, in late July 2000, mailed back to D.K.'s husband the signed and acknowledged L.O. deed, dated July 24, 2000, and an Affidavit of Consideration, dated July 13, 2000. With that in hand, D.K.'s husband had both the L.O. deed and the H.K. deed recorded at the Cape May County Clerk's Office on August 9, 2000.

In the meantime, H.K. continued to live in the Avalon home until September or October 2001, when she moved in with D.K. because H.K. "needed more attention" due to her deteriorating condition. As her disease progressed, H.K.'s care became more difficult. On April 9, 2002, H.K. disappeared for several hours. Members of the local police and fire department participated in the search for her, eventually finding her hiding in a car. That night, H.K. exhibited heightened anxiety, telling her daughter that she was hearing voices that "were scaring her." H.K. told D.K. that "[t]hey want me to hurt [D.K.'s son] Michael, the voices, the

dirty voices are telling me to hurt Michael." The next day, D.K. took her mother to the Atlantic City Medical Center where she was held overnight for observation in a crisis center. Later she was transferred for care at a behavioral center and remained there for approximately one month, until she was released to D.K.'s care.

On April 12, 2002, D.K. applied for Medicaid assistance on H.K.'s behalf, listing as her disabilities, Alzheimer's Disease, diverticulitis, and H.K.'s use of a pacemaker. The application was submitted nearly forty-five months after the H.K. deed was executed and twenty months after it was recorded. The Atlantic County Department of Human Services rejected the application, stating that "transfer of home has resulted in a 36 month period of ineligibility/penalty period that will expire 7/31/03 at which time you may reapply."

H.K. appealed that denial to DMAHS, which referred the matter to the OAL as a contested case. After an evidentiary hearing, an Administrative Law Judge (ALJ) issued an initial decision recommending H.K.'s eligibility. The ALJ found that H.K. had not successfully rebutted a regulatory presumption that the property was not conveyed "*exclusively* for some ... purpose other than Medicaid eligibility;" however, he nonetheless credited H.K.'s position that she was entitled to Medicaid eligibility. He based that recommendation on the testimony of D.K. and Wagenheim, which he found to be credible and persuasive on the issue of H.K.'s intent to convey the property. The ALJ explained that

[w]ith respect to the effective date of the conveyance of the Avalon property I FIND that petitioner clearly manifested an intent that the July 30, 1998 deed, conveying the Avalon property to her children, was intended to become immediately operative and that the grantees became the owners of the property on that date. The regulation cited by respondent, *N.J.A.C.* 10:71–4.10(m)li, which triggers calculation of the penalty period from the date of recordation of a deed, is limited to just that. If the deed was executed and recorded within the 36 month look-back period then the penalty period would be calculated from the recordation date. But those are not the facts herein. The deed was executed and delivered well outside the look-back period. There is a panoply of case law which holds that a conveyance is effective upon delivery of the valid deed. This is not a case where the proponent of the deed was involved in gamesmanship or other mischief in order to become

eligible for Medicaid. Petitioner fully manifests her intent to divest her interest in the property in 1998. Merely because her children did not record the deed until 2000 should not vitiate its validity and effectiveness in 1998. Petitioner was very convincing as to why the deed was not immediately recorded in 1998. Delays associated with conveyances arising through probate are not entirely uncommon. Therefore, petitioner's testimony that Estate of L.O., a matter that probated in Pennsylvania, held up the recording of the Avalon deed, makes sense. Moreover, since the Avalon deed was properly executed on July 30, 1998, petitioner was in no rush to record it. There was no evidence that the deed was backdated. Petitioner's attorney promptly prepared the deed in 1998. Correspondence and billing information fully support that it was executed on July 30, 1998. Two different law offices and several other parties were involved in the process. Accordingly, there was no evidence of collusion or other acts intended to circumvent the Medicaid eligibility determination in connection with the deed.

[Citations omitted.]

The ALJ concluded that H.K.'s Medicaid application should be evaluated as if the transfer of the Avalon property occurred on July 30, 1998, the date of execution of the deed conveying the property to H.K.'s children.

The Director of DMAHS rejected that recommended conclusion. Commenting that he perceived "no apparent tax consequence for this transfer," the Director questioned whether H.K. could produce any non-hearsay evidence that she had a present intent to convey ownership of the property to her children when the deed was signed. On that latter point he expressed skepticism, stating that "[i]t is within the realm of possibility that H.K. (and her children) intended the deed only to come into effect when she needed nursing home care," and that by executing the deed without the intent to presently convey title, "the family could wait and see if they needed to protect this asset from Medicaid," which is "exactly the scenario the regulations were enacted to prevent." Accordingly, the matter was remanded for further fact-finding on whether H.K. intended the children to become the immediate owners of the property and on where H.K. was planning to live after title to the property had transferred. The Director suggested that such evidence "might include tax collector records regarding payment of taxes."

While the matter was pending at the OAL, the parties negotiated a settlement that permitted H.K. to become eligible for Medic-

aid in July 2003, approximately thirty-six months after the deed was recorded. The ALJ found that the agreement disposed of all the issues and was consistent with law and, therefore, he recommended its approval. H.K.'s children took a mortgage on the property and placed H.K. in a nursing home in January 2003 only to learn later that month that the Director of DMAHS rejected the settlement. Declaring the settlement to be contrary to state and federal law because H.K. would not, in his view, be eligible for Medicaid benefits until February 2004, the Director again remanded to the OAL for further fact-finding on H.K.'s intent when transferring the property.

At the remand hearing, Wagenheim, D.K., H.K.'s son-in-law, B.K. (D.K.'s husband), and T.K. testified. Based on their testimony, the ALJ concluded that H.K.'s living situation was best characterized as "a loose and fluid family arrangement designed to care for a parent whose mental capacity was declining." The ALJ noted especially Wagenheim's testimony in which Wagenheim affirmed that he had been convinced that H.K. was competent and that she intended to convey the Avalon property at the time that the deed was signed. For completeness, the ALJ also found the following facts about the property and the parties' actions in respect of it:

H.K.'s children, D.K. or T.K. attempted to take advantage of the New Jersey homestead rebate program connected with the Avalon property during the period of 1997–2000. However, H.K. was determined to be ineligible or her application for the rebate was denied. D.K. was her legal representative pursuant to the power of attorney executed on July 30, 1998. Her son, T.K. was the person responsible for H.K.'s financial transactions and tax reporting. No tax deductions were taken by H.K. or anyone else for the real estate taxes because H.K. did not have enough itemized expenses. Therefore, according to T.K., she used the standard deduction. H.K. moved into the Avalon property in 1997[and] continued to reside ... there until September 2001. After September 2001, H.K. moved in with her daughter, D.K. As explained by D.K., nothing changed after the deed was executed in 1998. The children decided that H.K. was going to remain in Avalon because the conveyance was a family transaction not a business transaction. Petitioner would continue to pay the household expense[s] from her funding sources.

The ALJ concluded that the fact-finding at the remand hearing did not produce any further evidence that contradicted petitioner's intent at the time petitioner's attorney prepared and delivered the deed except, that her

children inadvertently submitted the New Jersey homestead rebate application for H.K. as if she owned the Avalon property. The rebate was denied for unknown reasons. This does not change the outcome of the case.

And, again, the ALJ recommended that H.K. should not be denied Medicaid assistance.

In an August 2003 decision, the Acting Director of DMAHS again rejected the ALJ's recommendations and again declared H.K. ineligible for Medicaid assistance as of the time of her application. The Acting Director concluded that H.K. had not demonstrated that she intended to convey title at the time she executed the deed, characterizing the evidence submitted on behalf of H.K. as hearsay that was not supported by sufficient reliable evidence. Accordingly, he determined that the appropriate effective date of the transfer was the date of the deed's recording.

Further, the Director cited *N.J.A.C.* 10:71–4.10(m)(1)(i), a regulation that was promulgated after the events of this case took place, and which establishes the date of deed recording as the date on which transfer of property will be deemed effective for certain Medicaid purposes. The Director described the regulation's purpose as the prevention of fraud and deception by individuals who did not intend to transfer property until Medicaid benefits were needed. He stated that that purpose was advanced by using the date of deed recording in H.K.'s case. The Director's decision emphasized that H.K. continued to live in the Avalon home, that only H.K. and her children knew of the deed signed in 1998, and that there was no indication that H.K. intended to let anyone know about the deed until she required Medicaid assistance. The Director concluded by ordering that the penalty period for H.K. be determined based on the August 9, 2000, recording date and the appraised value of the property as of that date. H.K. appealed.[2]

---

[2] We note for completeness that the parties made further attempts at settlement that were ultimately unsuccessful.

In an unpublished opinion, the Appellate Division affirmed. The panel noted that the alleged value of H.K.'s home was not sufficient in and of itself to trigger estate tax concerns, that the record lacked evidence to support the assertion that the property had been transferred to avoid federal tax consequences, and that H.K.'s resources had been used to pay for household expenses and taxes on the Avalon property. On balance, the panel declared itself satisfied that the agency decision finding H.K. ineligible for Medicaid assistance was not arbitrary or capricious.

We granted H.K.'s petition for certification. *H.K. v. Div. of Med. Assistance and Health Servs.*, 182 *N.J.* 628, 868 *A.*2d 1031 (2005).

## II.

None of the decisions below have taken into consideration the relatively recent pronouncement by this Court that approved the practice of "spend-down" activities by families in anticipation of rendering a family member eligible for Medicaid assistance. The legitimacy of Medicaid spend-down plans in preparation for Medicaid eligibility was recognized in *In re Keri*, 181 *N.J.* 50, 63–64, 853 *A.*2d 909 (2004). In *Keri*, an elderly woman's son sought to spend down her assets to accelerate her Medicaid eligibility. *Id.* at 55, 853 *A.*2d 909. Mildred Keri, ninety years old, was placed in a nursing home by her children due to dementia that prevented her from caring for herself. *Id.* at 54, 853 *A.*2d 909. Her son sought guardianship of his mother and her estate, and submitted for court approval a proposed Medicaid "spend-down" plan. *Id.* at 55, 853 *A.*2d 909. In this plan, he sought authority to sell his mother's house and transfer a significant portion of the proceeds to himself and his brother in equal shares in order to accelerate his mother's Medicaid eligibility. *Ibid.*

The trial court denied the son's request to proceed with the spend-down plan, "refusing to approve strategies designed to '[pauperize] human beings and citizens in the United States solely to make them [wards] of the taxpayers.' " *Id.* at 56, 853 *A.*2d 909.

The Appellate Division similarly rejected the spend-down proposal, *ibid.*, characterizing such plans as "nothing other than self-imposed impoverishment to obtain, at taxpayers' expense, benefits intended for the truly needy." *Id.* at 69, 853 *A.*2d 909 (quoting *In re Keri*, 356 *N.J.Super.* 170, 174, 811 *A.*2d 942 (App.Div.2002)). The panel held that approval of a spend-down plan proposed by adult children should only be given if the incompetent person indicated a preference for Medicaid planning before losing competency. *Id.* at 56, 853 *A.*2d 909.

■ We reversed, rejecting the lower courts' suspicion of spend-down plans. *Id.* at 63, 853 *A.*2d 909. Instead, the New York approach to Medicaid planning was adopted for use in this State "on the ground that a reasonable and competent person would prefer that the costs of his care be paid by the State, as opposed to his family." *Ibid.* (internal quotation omitted). Thus, legal guardians may make gifts from the estate, even when the guardians themselves may be the recipients of the transfers from the ward's assets, so long as there is substantial evidence that the incompetent would have made the gift proposed if competent. *Id.* at 62–63, 853 *A.*2d 909. And, noting that Medicaid planning is legally permissible under both federal and state Medicaid law, the Chief Justice, writing for our Court, commented that "[f]ew would suggest that it is improper for taxpayers to maximize their deductions under our tax laws to preserve income for themselves and their families—even though they are, by their actions, reducing the amount of money available to government for its public purposes." *Id.* at 69, 853 *A.*2d 909.

■ Thus, property transfer should not be viewed with skepticism and disapproval merely because it may precede Medicaid eligibility. Timely transfer of property, even if done to achieve eligibility status, is permissible. Furthermore, planning for the eventuality that Medicaid assistance may be required one day is not the equivalent of collusion to achieve that to which one is not entitled. Review of an individual's entitlement should not be

burdened with the suspicion of such duplicity. We turn then to the eligibility question before us.

## III.

### A.

Medicaid is an intensely regulated program. The regulations governing an individual's eligibility for Medicaid reimbursement of nursing home costs provide that in order for an individual to participate in the Medicaid Only Program, the value of that individual's resources [3] may not exceed $2,000. *N.J.A.C.* 10:71–4.5(c).

More to the point of this appeal, current regulations make an individual "ineligible for institutional level services through the Medicaid program if he or she ... has disposed of assets at less than fair market value at any time during or after the 36 month period ... immediately before [seeking participation in the program]." *N.J.A.C.* 10:71–4.10(a).[4] If an individual conveys an asset within the 36–month "look-back" period for less than fair market value, "[p]enalties of ineligibility shall be assessed." *N.J.A.C.* 10:71–4.10(b)(9)(iv). The regulations also state that a conveyance made during the look-back period raises a rebuttable presumption that the resource was transferred for the purpose of establishing Medicaid eligibility. *N.J.A.C.* 10:71–4.10(j). No period of ineligibility can attach, however, if the resource was transferred prior to the look-back period. *N.J.A.C.* 10:71–4.10(b)(9)(iv).

---

[3] A "resource" is defined as "any real or personal property which is owned by the applicant ... and which could be converted to cash to be used for his/her support and maintenance." *N.J.A.C.* 10:71–4.1(b).

[4] *N.J.A.C.* 10:71–4.10 is the new regulation cited by the Director that was promulgated and became effective on June 18, 2001. According to its terms, it purports to apply retroactively to individuals who have transferred assets "on or after August 11, 1993." *N.J.A.C.* 10:71–4.10(a). Because our analysis leads to the conclusion that H.K. transferred the Avalon property upon her execution of the deed, we need not reach any question about rule-making retroactivity.

And, the regulation is generally unspecific as to when transfer of real estate is pegged for look-back purposes. *But see N.J.A.C.* 10:71–4.10(*o*)(2) (setting deed recordation as date of transfer when another's name is added to deed, conveying co-ownership rights). In contradistinction, a specific methodology is set forth for use in determining the "penalty period" that may attach if a transfer is deemed to have lawfully occurred during the look-back period.

The penalty period is "the period of time during which payment for long-term care level services is denied." *N.J.A.C.* 10:71–4.10(m). Its duration is calculated as "the number of months equal to the total, cumulative uncompensated value of all assets transferred by the individual, on or after the look-back date, divided by the average monthly cost of nursing home services." *N.J.A.C.* 10:71–4.10(m)(1). Plainly, because the penalty period is determined in part by the appraised value of the property as of the date of transfer, the regulations create a precise modality for fixing that important valuation date: "[f]or the purpose of determining a penalty period, the transfer of real property shall be considered to have occurred the date the title is recorded or registered with the appropriate office." *N.J.A.C.* 10:71–4.10(m)(1)(i).

■ No such similar language is used in respect of the determination of the lawful date of a transfer for look-back purposes, perhaps because it is questionable whether DMAHS may, by regulation, make look-back eligibility determinations depend on a standard of law that is inconsistent with real estate transfers recognized by the common and statutory law. It is far from clear that DMAHS expected its regulations to be applied so,[5] and we

---

[5] The rulemaking record is ambiguous on this point, although we note that two comments questioned whether DMAHS could impose the date of deed recordation as the date of transfer recognized by Medicaid for eligibility purposes. 33 *N.J.R.* 2195(a), cmts. 14 and 47. DMAHS's response suggested that it thought that it could use the date of recordation within the context of its eligibility determinations. *Ibid.* Notwithstanding those comment responses, the agency did not advance that position before us, claiming instead that, in respect of

refrain from interpreting the regulation in a way that could call into question its lawfulness. Accordingly, to determine when real estate is conveyed for purposes of determining the legal date of a transfer (and not for purposes of calculating a "penalty period"), resort must be had to statutory and common law governing transfer of such property.

## B.

Ownership of real property is transferred by deed. *N.J.S.A.* 46:3–13. Transfer of a real property interest by deed is complete upon execution and delivery of the deed by the grantor, and acceptance of the deed by the grantee. *In re Estate of Lillis,* 123 *N.J.Super.* 280, 285, 302 *A.*2d 539 (App.Div.1973). In other words, a deed transfers a property interest "upon delivery." *Tobar Constr. Co. v. R.C.P. Assocs.,* 293 *N.J.Super.* 409, 413, 680 *A.*2d 1121 (App.Div.1996). However, "[w]hether delivery and acceptance have taken place . . . is a matter of intention." *Dautel Builders v. Borough of Franklin,* 11 *N.J. Tax* 353, 357 (1990). "If there is physical delivery without the requisite intent that the deed be presently effective as a conveyance of the grantor's title, there is, in legal contemplation, no delivery." *Ibid.* (citation omitted). Delivery can be shown by "[a]nything that clearly manifests the grantor's intention that the deed become immediately operative and that the grantee become the owner of the estate purportedly conveyed." *Ibid.* (citation omitted). The deed does not need to be recorded, therefore, in order to pass title. *Tobar Constr. Co., supra,* 293 *N.J.Super.* at 413, 680 *A.*2d 1121.

Recordation of a deed serves to protect creditors. By statute, an unrecorded deed is

---

determining when a transfer occurred for look-back purposes, the agency did not intend to displace the common law. We apply that view of the agency's regulations in this matter. If the agency seeks to achieve another result, we would suggest that further rule-making activity is required and express no view on questions concerning retroactive application of any rule that might be promulgated in derogation of the common law.

void and of no effect against subsequent judgment creditors without notice, and against all subsequent bona fide purchasers and mortgagees for valuable consideration, not having notice thereof, whose deed shall have been first duly recorded or whose mortgage shall have been first duly recorded or registered; but *any such deed or instrument shall be valid and operative, although not recorded, except as against such subsequent judgment creditors, purchasers and mortgagees.*

[*N.J.S.A.* 46:22–1 (emphasis added). *See also Tobar, supra,* 293 *N.J.Super.* at 413, 680 *A.*2d 1121 (noting that "actual or constructive notice is required to affect the rights of third parties such as judgment creditors").]

Thus, an unrecorded deed "is perfectly efficacious in passing title from grantor to grantee, subject to all subsequent recorded liens against the grantor and subject to potential divestment by a subsequent bona fide grantee without notice." *Siligato v. State,* 268 *N.J.Super.* 21, 28, 632 *A.*2d 837 (App.Div.1993).

## C.

To the best we are able to determine, DMAHS has been applying existent common law principles in respect of when a transfer of real estate has occurred, appropriately focusing on execution of a deed accompanied by delivery and acceptance with the requisite intent to convey the real property. *See L.A. v. Div. of Med. Assistance and Health Servs.,* 96 *N.J.A.R.*2d 92, 1996 *WL* 784644 (Div. of Med. Assistance) (holding that despite six-year gap between gift deed's signing and recordation, transfer effective on date of signing and, therefore, petitioner eligible for Medicaid assistance). Stated otherwise, DMAHS previously has not taken the position that it is among the protected classes generally entitled to recording notice under *N.J.S.A.* 46:22–1. *See C.D. v. Div. of Med. Assistance and Health Servs.,* 93 *N.J.A.R.*2d 91, 1993 *WL* 471193 (Div. of Med. Assistance) (holding that DMAHS is not among classes protected by *N.J.S.A.* 46:22–1 and concluding that property was transferred on date that deed was signed, not on recording date). As noted previously, with the promulgation of *N.J.A.C.* 10:71–4.10, DMAHS has required recordation of a deed for certain purposes. *See N.J.A.C.* 10:71–4.10(m)(1)(i). ("For the purpose of determining a penalty period, the transfer of real property shall be considered to have occurred the date the title is recorded or registered with the appropriate office"); –4.10(*o*)(2)

("In the case of real property, . . . if another name is added to a deed [conferring on that person the right to restrict the original owner's ability to sell or dispose of asset], the transfer shall be considered to have occurred the date the new deed is recorded"). Those provisions, however, are not applicable to establishment of the transfer date on which H.K.'s Avalon property was conveyed to her children.

Rather, application of the common law persuades us that H.K. conveyed her property to her children on July 30, 1998, when she executed the H.K. deed to the Avalon property, as was testified to by Wagenheim, D.K., and T.K. The ALJ found those witnesses to be credible and generally it is not for us or the agency head to disturb that credibility determination, made after due consideration of the witnesses' testimony and demeanor during the hearing. *See Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 587, 538 *A.*2d 794 (1988) (noting that Appellate Division need not have deferred to agency head on issue of credibility of witnesses when it was ALJ, and not agency head, who heard live testimony, and who was in position to judge witnesses' credibility). *See also N.J.S.A.* 52:14B–10(c) (indicating that director of agency "may not reject or modify any findings of fact as to issues of credibility . . . unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record."). Although ordinarily an agency determination is entitled to deference in respect of the expertise that the agency head brings to the statutory scheme that he or she is charged with administering, *Smith v. Director, Div. of Taxation*, 108 *N.J.* 19, 25, 527 *A.*2d 843 (1987), here, however, there was a simple credibility call made by an ALJ against the backdrop of well-established common law principles of real estate conveyance. The ALJ was well-situated to make that credibility determination about witnesses' testimony in respect of H.K.'s stated intentions and their responsive actions in respect of a deed executed forty-five months before a Medicaid application was made. It is not

unusual to rely on such evidence in respect of donor intent. *Cf. In re Cook*, 44 *N.J.* 1, 6, 9–10, 206 *A.*2d 865 (1965) (admitting testimony about statements by testatrix as to her intent); *Wilson v. Flowers*, 58 *N.J.* 250, 261–63, 277 *A.*2d 199 (1971) (admitting testator's memoranda and scrivener's testimony in respect of testator's statements). Indeed, it was unreasonable for the Acting Director to have required more in terms of proof of intent to convey the Avalon property. *See SSI Med. Servs., Inc. v. State, Dept. of Human Servs.*, 146 *N.J.* 614, 621, 685 *A.*2d 1 (1996) (stating that "agency has no expertise to decide purely legal issues"). Under the proper standard of proof for whether a conveyance occurred upon execution of H.K.'s deed in 1998, the evidence in this record supported the ALJ's findings.

■■■■ The agency head erred by importing the rebuttable presumption that applies within the look-back period to the period of time that preceded that look-back period. No rebuttable presumption applies outside of the look-back period. *See N.J.A.C.* 10:71–4.10(a) and (c) (noting that provisions regarding transfer of assets, including rebuttable presumption, apply to transfers of assets for less than fair market value that take place during thirty-six month look-back period). One cannot extend the look-back period's rebuttable presumption to earlier events merely because deed recordation occurred during the look-back. Rather, the initial deed execution must be examined for proof of the common law requirements that made the transfer lawfully complete at that time. That was the analysis that the ALJ correctly utilized.

At the time that the H.K. deed was executed, which occurred well before the look-back period, H.K. could have simply gifted the Avalon house to her children without needing a "favorable tax consequence" as cover in order to be eligible forty-five months later for Medicaid. The gift was a permissible step, as *Keri* has held. That gift is not the equivalent of subversion of the Medicaid system. Moreover, this record does not convey the feeling of underhandedness that the Director's decisions suggest. The deed

was executed under the circumstances that involved knowledge by many family members (H.K.'s sister, her children, and her son-in-law) as well as attorneys involved both in the L.O. estate and from Waganheim's office.[6] The subterfuge that the Director's office interjects into this family's efforts to address the needs of a woman during her waning years is inconsistent with the *Keri* approach, under which steps taken to preserve assets for family members and to collaterally enhance one's entitlement for later Medicaid eligibility are entirely appropriate when permitted by law.

We agree with the ALJ's benevolent interpretation of H.K.'s family's well-intentioned, but haphazard, efforts to follow up more promptly with deed recordation, which nevertheless was accomplished twenty months before an application for Medicaid was sought. Indeed, that application appears from this record to have been generated rather spontaneously when H.K.'s dwindling psychological well-being took a dangerous turn for the worse for the larger family unit residing in D.K.'s home. We also do not find a nefarious intention in the ill-conceived and unsuccessful attempt by T.K. to seek some entitlement to a senior citizen tax rebate in connection with the Avalon property while H.K. was still living there.

In sum, we find that this is one of the uncommon instances when the agency determination is not entitled to deference. Relying comfortably on the ALJ's findings, we conclude that the transfer of the Avalon property occurred on July 30, 1998, the date on which the deed to the property was executed, conveyed to her heirs, and accepted by them. Thus, H.K.'s transfer of the

---

[6] The ALJ noted that H.K.'s living situation

was a loose and fluid family arrangement designed to care for a parent whose mental capacity was declining. At the time she executed the deed she was lucid and competent. Mr. Wagenheim ... was adequately convinced that H.K. intended to convey the Avalon property at that time. She was interviewed alone in Wagenheim's office and he confirmed her intentions verbally as well as by her executing the deed and letter confirming her intentions.

property to her children for less than fair market value did not occur within the look-back period that pertained in respect of her subsequent application for Medicaid assistance. We reverse the determinations below that found H.K. ineligible for Medicaid assistance based on the timing of the conveyance to her children.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to DMAHS for further action consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ, Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.