**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3087-15T4

E.B.,

    Petitioner-Appellant,

v.

DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES and CAMDEN
COUNTY BOARD OF SOCIAL
SERVICES,

    Respondents-Respondents.

_____

Argued December 11, 2017 — Decided July 13, 2018

Before Judges Accurso and O'Connor.

On appeal from the Department of Human
Services, Division of Medical Assistance and
Health Services.

Samuel B. Fineman argued the cause for
appellant (Cohen Fineman, LLC, attorneys;
Samuel B. Fineman, of counsel and on the
brief).

Melissa Bayly, Deputy Attorney General,
argued the cause for respondent Division of
Medical Assistance and Health Services
(Christopher S. Porrino, Attorney General,
attorney; Melissa H. Raksa, Assistant

Attorney General, of counsel, Melissa Bayly,
on the brief).

PER CURIAM

Petitioner E.B. sought Medicaid benefits to pay for the cost of her nursing home care. Respondent Camden County Board of Social Services (Board) imposed a transfer penalty of $69,211.90, because petitioner transferred resources for less than fair market value during the "look-back period"[1] preceding her admission into a nursing home.

After an evidentiary hearing, an Administrative Law Judge (ALJ) affirmed the Board in an initial decision. Petitioner appealed from such decision, but the Division of Medical Assistance and Health Services (Division) adopted the initial decision, affirming the penalty. Petitioner now appeals from the Division's decision. We affirm.

I

Petitioner entered a nursing home on May 29, 2013. Through her daughter, J.W., petitioner applied for Medicaid benefits to cover the cost of the nursing home. The application was approved, but with a transfer of assets penalty in the amount of

---

[1] "The look-back period is a fixed term of months preceding an application for Medicaid benefits in which transfers of assets or income are closely scrutinized to determine if they were made for the sole purpose of Medicaid qualification." E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 344 (App. Div. 2010) (citing H.K. v. State, 184 N.J. 367, 380)).

2

$99,754.80. Petitioner challenged the penalty, and the Board determined some of the transfers were in fact for fair value and reduced the penalty to $82,102.94. Petitioner appealed, and the matter was transferred to the Office of Administrative Law as a contested case. Just before the hearing, the Board agreed to reduce the penalty to $69,211.90, finding other expenditures made by petitioner during the look-back period were acceptable.

The salient evidence was provided by J.W. She testified that, in 2003, her then eighty-year old mother moved into her home. There was an area of J.W.'s home which, although physically attached to the house, was a separate unit. That unit comprised a living room, bedroom, and bathroom, and is where petitioner lived. The family referred to this living area as petitioner's "apartment." Petitioner moved into the apartment because she was afraid of living by herself and was unable to shop or cook for herself.

In 2009, petitioner was diagnosed with Lewy Body Dementia.[2] Soon after her diagnosis, petitioner became intermittently delusional, requiring J.W. and the members of her household to keep "an eye on" and "an ear out" for her. By 2011, a family

---

[2] "[A] degenerative cerebral disorder of the elderly, characterized initially by progressive dementia or psychosis, and subsequently by parkinsonian findings, usually with severe rigidity. . . ." Stedman's Medical Dictionary 555 (28th ed. 2006).

member had to be in the same room as petitioner at all times. When the family went to sleep, J.W. kept a baby monitor on in her bedroom so she could hear petitioner if she arose during the night.

In 2009, J.W. resigned from her position as an insurance adjuster in order to care for her mother full time. At times, other family members or a friend helped with petitioner's care. In addition to providing supervision, J.W. assisted her mother with the activities of daily living, although she hired a professional caretaker to assist with bathing petitioner.

In 2011, J.W. was finding it too difficult to make ends meet because she was not earning income. She determined she either had to return to work and let a third party care for her mother during the day, or pay herself from petitioner's savings to compensate her for providing companion services. She chose the latter solution. At that time, J.W. held power of attorney for petitioner. J.W. did not provide any details about her budget and what had changed since 2009 that made it necessary for her to return to work.

J.W. searched "Craigslist"[3] to learn the average wage of companion caretakers, and ascertained the wages ranged from

---

[3] "A website of classified ads and community notices that serves an urban area." PCMAG.COM,

eight to twelve dollars per hour. J.W. admitted the site did not provide the tasks a companion was expected to perform for this particular wage range.

J.W. decided to pay herself ten dollars per hour from petitioner's funds to provide companion services to her mother. Specifically, J.W. paid herself $400 per week to provide forty hours of companion services, plus $25 per week for the two-and-a-half hours she claimed she spent each week to shop for petitioner's food, medication, and toiletries. J.W. paid herself $425 per week from April 2011 to May 2013, when petitioner entered the nursing home. J.W. did not keep a ledger of the services she provided and the days and hours she performed them. J.W. claimed that, when lucid, her mother understood and agreed to J.W. paying herself from petitioner's funds to compensate J.W. for her services.

J.W. also testified she never intended to place petitioner in a nursing home; her plan was to care for her mother for the remainder of her mother's life. However, in 2013, petitioner fell and was no longer able to communicate. J.W. determined she could no longer care for her and decided petitioner had to be placed in a nursing home. Family members and one friend also

https://www.pcmag.com/encyclopedia/term/56356/craigslist (last visited June 25, 2018).

5

testified about providing companion services for petitioner, but J.W. predominantly provided the services at issue.

Following the hearing, the ALJ found the $69,211.90 removed from petitioner's funds in order to pay for companion services was not for fair value, and in an initial decision affirmed the imposition of the Board's transfer penalty. First, the ALJ found the "proof of services rendered on a daily basis to the petitioner" deficient. Although the ALJ did not elaborate on how the proofs were lacking, it is implicit he was referring to the complete absence of any evidence detailing when and what specific tasks J.W. performed for petitioner. There were no log sheets or like records tracking the hours she worked and the duties she performed.

Second, the ALJ found the hourly rate paid to J.W. was not substantiated as appropriate for companion services. Third, he noted J.W. began receiving wages when it was "foreseeable that [petitioner's] advanced age and deteriorating condition would require intensive care and the possibility of entering a nursing care facility." Finally, he observed there was no pre-existing written agreement between petitioner and J.W. to pay for the subject services.

Petitioner appealed to the Division, but it adopted the ALJ's initial decision, noting petitioner failed to show she

6

received fair market value for the assets she transferred during the look-back period.

## II

On appeal, petitioner contends the Division's decision is arbitrary, capricious, and unreasonable because she rebutted the presumption she transferred her assets for less than fair market value during the look-back period and, further, the Division misapplied the applicable case law.

"Appellate courts have 'a limited role' in the review of [administrative agency] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). We are bound to defer to an agency decision unless we conclude it is "arbitrary, capricious or unreasonable, or [] not supported by substantial credible evidence in the record as a whole." Stallworth, 208 N.J. at 194 (alteration in original) (quoting Henry, 81 N.J. at 579-80). "Deference to an agency decision is particularly appropriate where interpretation of the [a]gency's own regulation is in issue." R.S. v. Div. of Med. Assistance & Health Servs., 434 N.J. Super. 250, 261 (App. Div. 2014) (quoting I.L. v. N.J. Dep't of Human Servs., Div. of Med. Assistance & Health Servs., 389 N.J. Super. 354, 364 (App. Div. 2006)).

7

Among other eligibility requirements, an individual seeking nursing home benefits must have limited financial eligibility. See N.J.A.C. 10:71-1.2(a). Specifically, "[t]he regulations governing an individual's eligibility for Medicaid reimbursement of nursing home costs provide that in order for an individual to [receive such benefits], the value of that individual's resources may not exceed $2,000." H.K., 184 N.J. at 380 (footnote omitted) (citing N.J.A.C. 10:71-4.5(c)).

An applicant is ineligible for Medicaid nursing home benefits if the individual "has disposed of assets at less than fair market value at any time during or after the 60-month period immediately before . . . the date the individual applies for Medicaid as an institutionalized individual," referred to as the "look-back" period. N.J.A.C. 10:71-4.10(a)(2); see also N.J.A.C. 10:71-4.10(b)(9)(ii). Fair market value is defined as:

> an estimate of the value of an asset, based on generally available market information, if sold at the prevailing price at the time it was actually transferred. Value shall be based on the criteria for evaluating assets as found in N.J.A.C. 10:71-4.1(d).
>
> [N.J.A.C. 10:71-4.10(b)6.]

If an applicant transfers assets during the look-back period for less than fair market value, there is a rebuttable presumption "the [asset] was transferred for the purpose of

8

establishing Medicaid eligibility." H.K., 184 N.J. at 380 (citing N.J.A.C. 10:71-4.10(j)). The burden of rebutting the presumption rests on the applicant, who must provide "convincing evidence" the asset was transferred exclusively for some purpose other than to establish eligibility. N.J.A.C. 10:71-4.10(j). The purpose of imposing a penalty for disposing assets for less than fair market value during the look-back period is to maximize Medicaid resources for those truly in need. See Estate of DeMartino v. Div. of Med. Assistance & Health Servs., 373 N.J. Super. 210, 219 (App. Div. 2004).

Here, J.W. and, on occasion, other family members, provided care to petitioner for approximately two years without compensation. Then, in April 2011, J.W. determined she was in need of money and rationalized that, because she left her job to care for petitioner, it was acceptable for her to pay herself from petitioner's funds to perform services she had previously provided gratuitously out of love and affection.

We understand J.W.'s reasoning, specifically, that if she had to return to work, petitioner may as well pay her rather than a third party to provide companion services, especially because J.W. is a family member and would have her best interests in mind. Nevertheless, "a transfer of assets to a friend or relative for the alleged purpose of compensating for

9

care or services provided free in the past shall be presumed to have been transferred for no compensation."  N.J.A.C. 10:71-4.10(b)(6)ii.

Petitioner did not rebut this presumption.  She did not provide the requisite "convincing evidence" the asset was transferred exclusively for some purpose other than to establish eligibility.  First, J.W. did not show why she could not have paid a competent professional ten dollars per hour to take care of her mother, which would have freed her up to return to work.  As a former claims adjuster, presumably J.W. was capable of earning more than ten dollars per hour and, thus, would have been in a better position to address her budget needs.  Further, while a third party may not have been a relative, that does not mean a competent professional caretaker could not have been located to meet petitioner's needs.

Second, J.W. offered few details about when and what specific services she provided during each pay period, which is hardly consistent with providing the requisite convincing evidence petitioner's assets were transferred exclusively for some purpose other than to establish eligibility.  N.J.A.C. 10:71-4.10(j).  Third, as the ALJ noted, J.W. began receiving wages when it was "foreseeable that [petitioner's] advanced age

10

and deteriorating condition would require intensive care and the possibility of entering a nursing care facility."

In the final analysis, petitioner failed to show her assets were transferred for fair value. Supported by substantial and credible evidence, the Division's final decision was neither arbitrary, capricious, nor unreasonable.

Petitioner's remaining arguments either lack sufficient merit to warrant further discussion in our opinion, see Rule 2:11-3(e)(1)(E), or were not presented when petitioner was before the agency. We will not consider questions or issues not properly presented to the agency when the opportunity was available "unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)).

Finally, petitioner correctly points out and the Division concedes there is a typographical error in the Division's final decision. The decision states the penalty transfer is $68,756.90 when in fact the penalty is $69,211.90.

Affirmed and remanded for entry of a corrected final decision to state the transfer penalty is $69,211.90.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3087-15T4