**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3923-22

IN THE MATTER OF
JOSEPH DEMARCO, BAYSIDE
STATE PRISON, DEPARTMENT
OF CORRECTIONS.

_____

Submitted December 18, 2024 – Decided March 26, 2025

Before Judges Paganelli and Torregrossa-O'Connor.

On appeal from the New Jersey Civil Service Commission, Docket No. 2021-0988.

Agre & St. John, attorneys for appellant Joseph DeMarco (Christopher St. John, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Department of Corrections, Bayside State Prison (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Gary W. Baldwin, Deputy Attorney General, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Brian D. Ragunan, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Joseph DeMarco appeals from the Civil Service Commission's (Commission) July 19, 2023 Final Administrative Action adopting the initial decision of the Administrative Law Judge (ALJ) that his removal by Bayside State Prison, Department of Corrections (DOC) was justified. We affirm.

The disciplinary action was initiated because on June 8, 2020, Joseph was reported to have been at his brother's, James's[1] wood yard, along the path of a Black Lives Matter march following the murder of George Floyd. At the wood yard, James and his son reenacted George Floyd's murder. In addition, another individual was heard shouting "to no one" in response to the chant "Black Lives Matter." Joseph stayed at the wood yard and videotaped the march throughout the offensive conduct. Moreover, discipline was initiated because Joseph had secondary employment, at the wood yard, but had failed to report it as required.

The DOC issued a Preliminary Notice of Disciplinary Action (PNDA) charging Joseph, a Senior Correctional Police Officer (SCPO), with: (1) "conduct unbecoming an employee," N.J.A.C. 4A:2-2.3(a)(6); and (2) "other sufficient cause," N.J.A.C. 4A:2-2.3(a)(12). Joseph "requested a departmental hearing on the charges." The charges were upheld, "Final Notices of

---

[1] Because Joseph and James share the same surname, we use their first names to identify them in this opinion. We intend no disrespect.

Disciplinary Action [FNDA], were issued," and Joseph was removed from employment based on "conduct unbecoming" and "other sufficient cause." The "other sufficient cause" charge included violations of:

> HRB [Human Resources Bulletin] 84-17, as amended, C8 [f]alsification: [i]ntentional misstatement of material fact in connection with work employment application, attendance or in any record, report, [i]nvestigation or other proceeding; C11 [c]onduct unbecoming an employee; [and] E1 [v]iolation of a rule, regulation, policy, procedure, order or administrative decision.[2]

Joseph appealed his removal and "the matter was referred to the Office of Administrative Law as a contested case." The ALJ held a two-day hearing. The parties jointly submitted Joseph's video. Further, the DOC submitted various exhibits including: investigation reports; photographic evidence; protest video exhibits; two interviews of Joseph and an interview of Leonard Smith, a DOC SCPO, who was invited to the wood yard by Joseph on the day of the march; articles related to the event; and various DOC policies and rules and regulations.

---

[2] The DOC issued a second PNDA charging Joseph with a violation of the DOC's Policy Prohibiting Discrimination in the Workplace. The ALJ did not sustain the charge, concluding there was "no factual or legal support for [the DOC's] conclusion that the events at the wood yard on June 8, 2020, constitute[d] a reasonable extension of the DOC's workplace." The Commission adopted the ALJ's initial decision, including this conclusion.

The DOC presented testimony from: (1) Timathy Gonzalez, a principal investigator in the Special Investigations Division of the DOC; (2) Brian LaBonne, a regional major for the DOC; (3) Smith; and (4) Peter Thambidurai, the DOC's Equal Employment Opportunity and Ethics Officer. The ALJ found Gonzalez's, LaBonne's, Thambidurai's, and Smith's testimony to be "credible and without improper motivation or bias." The ALJ found Gonzalez's and LaBonne's testimony "reasonable and reliable" and Thambidurai's testimony to be "reliable." In addition, although noting Smith's acknowledgment that "he [wa]s no longer friends with [Joseph], and that he may have an interest in avoiding disciplinary action," the ALJ found his testimony was "straightforward" and "consistent with other evidence in the record including that of" Joseph.

Joseph testified on his own behalf and presented the testimony of: (1) James; (2) Bernard Wille, a retired DOC security major; (3), Robert Barrientos, Jr., a DOC corrections officer; (4) Christopher Cole, a DOC corrections officer; and (5) Brian Darcy, a DOC lieutenant.

The ALJ noted Joseph's "acknowledg[ment] that looking back, he would do things differently" and "that he should have 'walked away.'" However, in other respects, the ALJ did "not accept [Joseph]'s testimony as credible or

reliable." Instead, the ALJ found Joseph's testimony was "inconsistent with other evidence in the record." Specifically, the ALJ found Joseph's testimony that he was in "shock" because of James's actions was inconsistent with his "casual, conversational tone without any audible indication of shock or surprise" and with his admission that he "observed [James]'s actions and heard his comments but then almost immediately returned his attention to videoing the protest march." The ALJ found Joseph did not display a "genuine experience or expression of shock, surprise, or disapproval."

Further, the ALJ found Joseph's testimony that "he did not report his [work] activity at the wood yard because he did not consider it to be employment" did "not ring true and [wa]s inconsistent with his prior statement." The ALJ noted that in his statements to the DOC, Joseph "acknowledged that he derived income from the wood yard but did not disclose this to the DOC."

The ALJ did not find James's testimony "credible, reasonable or reliable." Rather, the ALJ found James's testimony to be "overly exaggerated"; not to "ring true"; "directly contradicted" and "inconsistent" with Joseph's testimony and "the ample video evidence in the record." Further, the ALJ found that James's testimony that the "mock reenactment of George Floyd's murder" was "unplanned," did "not hang together" because "the video evidence

5

demonstrate[d] that there was some prior planning/notice at least between the direct participants, if not also to others." Lastly, the ALJ found "James'[s] testimony that he did not consider his selling of firewood to be a 'business'" and that he "only provided [Joseph] with occasional reimbursement for gas or bought him food was not reasonable and did not ring true."

The ALJ found Wille's testimony "credible." The ALJ found Wille's testimony, that Joseph "should have reported his [work] activity at the wood yard regardless of whether it was done for compensation," was "straightforward and reasonable." Similarly, the ALJ found Cole's and Darcy's testimony as to Joseph's character was reasonable and credible. However, the ALJ found Wille, Cole, and Darcy had "no direct knowledge or information concerning [Joseph]'s action in connection with the events of June 8, 2020."

The ALJ sustained the disciplinary charges for: (1) "'[c]onduct unbecoming a public employee,' pursuant to N.J.A.C. 4A:2-2.3(a)(6)," and (2) "[o]ther sufficient cause," pursuant to N.J.A.C. 4A:2-2.3(a)(12).

In concluding Joseph's conduct was "unbecoming a public employee," the ALJ determined Joseph violated the regulation when:

> he remained at the wood yard and continued to video the protest march while [James] conducted the mock reenactment and yelled comments at the protestors, and while others in the wood yard replied, "to no one" and

"Black Lives Matter, to no one," in response to the protestors' chants. [Joseph]'s failure to attempt to take action to stop or deescalate the offensive, inflammatory, derogatory, and racially insensitive, actions and comments of [James] or the offensive, derogatory, and discriminatory comments of others at the wood yard, or at a minimum, his failure to separate himself from these actions and comments, offend the publicly accepted standards of decency and good behavior.

The ALJ noted that James's "egregious and offensive" actions—including the "mock reenactment"—"just two weeks after [George] Floyd was killed," "garnered much attention with the public, the media, and within [the] DOC."

The ALJ acknowledged that Joseph was "mistakenly identified . . . as one of the individuals directly involved in the reenactment," but nonetheless found Joseph's

continued presence at the wood yard and his failure to act, gave an impression of condoning, and/or lent tacit, if not actual support, for James's actions. Further, . . . he acknowledged that he witnessed [James] and his nephew positioning themselves into place and said, as the protestors were nearing by [the] wood yard, "No, you're not going to kneel on his neck. Oh my God," thus, it is clear that at least by this point, [Joseph] was fully aware of [James]'s actions but remained at the scene and continued to video the protest. [Joseph]'s continued presence at the scene and his continued act of recording the march was inappropriate and brought discredit to himself and to the DOC. [Joseph]'s actions and failure to act are of the type that have the tendency to destroy, and did in fact, negatively impact the public

7

respect and confidence in the DOC's delivery of services. This loss of public respect and confidence was demonstrated by the numerous complaints received from the public and [the] DOC staff concerning the events of June 8, 2020.

In addition, the ALJ found Joseph's

actions of remaining at the scene and his failure to act, including failing to attempt to stop or deescalate the situation or at a minimum, failing to remove himself from the situation, demonstrate[d] an extreme lack in the good judgment and tact required of law enforcement, f[e]ll far short of the high standards required of a correctional police officer, represent a fundamental misunderstanding of [Joseph]'s job duties and responsibilities as a correctional police officer, and are violative of the public trust.

The ALJ concluded Joseph's "actions constitute[d] conduct unbecoming in violation of N.J.A.C. 4A:2-2.3(a)(6) and" sustained the charge.

In addition, the ALJ concluded Joseph was subject to discipline for "other sufficient cause," under N.J.A.C. 4A:2-2.3(a)(12), finding his: (1) "acknowledg[ments] that firewood sales were a family business," "he earned a profit from same," and "he did not report this secondary employment," was a violation of HRB 84-17; and (2) "actions and failure to act in connection with the events of June 8, 2020" was "conduct unbecoming under C11 of HRB 84-17" and "violate[d the] DOC's Law Enforcement Personnel Rules and Regulations, its Standards of Professional Conduct, and its Code of Ethics."

8

In considering the appropriate sanction, the ALJ recognized "the concept of progressive discipline must be considered." However, the ALJ stated "removal [could be] appropriate notwithstanding a largely unblemished prior record." Moreover, the ALJ noted "it [wa]s well established that where the underlying conduct is of an egregious nature, the imposition of a penalty up to and including removal [wa]s appropriate."

The ALJ considered Joseph's "lack of significant disciplinary history," but nonetheless concluded that "returning [Joseph] to his position . . . would be contrary to the [DOC]'s interest in maintaining safety, discipline, order, and morale within the DOC and in maintaining the public's trust and confidence."

On July 19, 2023, the Commission, after "[h]aving considered the record and the ALJ's initial decision, and having made an independent evaluation of the record," "adopted the ALJ's Findings of Facts and Conclusions and [the ALJ's] recommendation to uphold removal" and concluded "that the action of the [DOC] in removing [Joseph] was justified" and upheld the DOC's action.

On appeal, Joseph argues the Commission erred because: (1) the evidence presented did not establish conduct unbecoming a public employee; (2) his "occasional assistance at his brother's wood yard did not rise to the level of secondary approval requiring DOC approval"; and (3) the penalty of removal

was "unduly harsh, excessive, and contrary to the principles of progressive discipline."

We "have a limited role in reviewing a decision of an administrative agency. Ordinarily, an appellate court will reverse the decision of the administrative agency only if it is arbitrary, capricious or unreasonable . . . ." Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980). To determine if an agency decision is arbitrary, capricious, or unreasonable, a court examines:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Ambroise, 258 N.J. 180, 198 (2024) (quoting In re Carter, 191 N.J. 474, 482 (2007)).]

"The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the person challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006). There is a "strong presumption of reasonableness that an appellate court must accord an administrative agency's exercise of statutorily delegated responsibility." Newark v. Nat. Res. Council, 82 N.J. 530, 539 (1980).

We defer to an agency's findings of fact where the findings are supported by substantial credible evidence. See In re Taylor, 158 N.J. 644, 656 (1999). Further, we defer to credibility findings if they were "made after due consideration of the witnesses' testimony and demeanor during the hearing." H.K. v. State, Dep't of Hum. Servs., 184 N.J. 367, 384 (2005).

Also, a "deferential standard applies to the review of disciplinary sanctions." In re Herrmann, 192 N.J. 19, 28 (2007). "In light of the deference owed to such determinations, when reviewing administrative sanctions, 'the test . . . is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness.'" Id. at 28-29 (quoting In re Polk, 90 N.J. 550, 578 (1982)). "The threshold of 'shocking' the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result." Id. at 29.

"However, when an agency's decision is based on the 'agency's interpretation of a statute or its determination of a strictly legal issue,' we are not bound by the agency's interpretation." Saccone v. Bd. of Trs. of Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). We "review issues of law de novo." Cumberland Farms, Inc. v. N.J. Dept. of Env't Prot., 447 N.J. Super.

11

423, 438 (App. Div. 2016). "The determination of what constitutes conduct unbecoming a public employee is primarily a question of law." Karins v. Atl. City, 152 N.J. 532, 553 (1998). Similarly, therefore, what constitutes other sufficient cause would be a question of law.

In conducting our evaluation of whether conduct reaches the level of "conduct unbecoming," we recognize "[t]he phrase is an elastic one." Id. at 554 (alteration in original) (quoting In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960)). We consider whether the conduct and behavior: (1) "adversely affect[ed] the morale" of the DOC; (2) "ha[d] the tendency to destroy public respect for" or "public confidence in" the DOC; and (3) "clearly offend[ed] accepted standards of decency." Id. 556-57.

Other sufficient cause constitutes "a true 'catch-all' provision, allowing discipline" under the Code. McLaughlin, N.J. Education Employment & Civil Service Law, § 26:2-2 (2024).

Applying these well-established principles, we conclude Joseph has failed to satisfy his burden to establish the Commission's decision to uphold his removal was arbitrary, capricious or unreasonable. Given our standard of review, we find no basis to disturb the factual findings, nor the credibility determinations. The factual findings were fully supported in the record and the

detailed credibility determinations were based on the ALJ's observations of the witnesses and review of the evidence.

In addition, after our de novo review, we are convinced that Joseph's conduct rose to the level of "conduct unbecoming" and "other sufficient cause." In refuting the "conduct unbecoming" charge, Joseph attempts to minimize the behaviors of those around him—"[t]here was no[] back and forth"; the response to the Black Lives Matter chant was "one comment"; "[t]here were no threats made nor was there any physical violence"—and argues "[t]he DOC is attempting to attribute James['s] . . . conduct to" him. However, these arguments miss the mark.

Joseph's acknowledgment that he "would do things differently" and "that he should have 'walked away'" undermines the notion that the behaviors did not require at least his extraction from the offensive environment. Moreover, Joseph remained at the wood yard and continued to video record the march, during and after the reenactment of George Floyd's murder and in the midst of others responding "to no one" after the marchers stated "Black Lives Matter." Joseph's conduct indisputably adversely affected DOC morale, tended to destroy public confidence and respect in the DOC, and was offensive to accepted standards of

13

decency. Therefore, Joseph's conduct was unbecoming of a public employee. See Karins, 152 N.J. at 556-57.

Moreover, we are convinced that Joseph's failure to report his admitted work at the wood yard was sufficient to sustain the charge of other "sufficient cause."

Lastly, and again applying a deferential standard, we recognize the concept of progressive discipline, and Joseph's length of service and insignificant disciplinary history. Nonetheless, given Joseph's egregious conduct, we are in no way shocked by his removal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

14